STATE OF NEW YORK, Plaintiff,

v.

N. STORONSKE COOPERAGE COMPA-
NY, INC. and Michael Greenberg in his
capacity as President of N. Storonske
Cooperage Company, Inc., and Contain-
er Management Corporation, Inc., De-
fendants.

No. 87–CV–1351.

United States District Court,
N.D. New York.

Nov. 1, 1994.

G. Oliver Koppel, Atty. Gen. of State of N.Y. (Maureen F. Leary, Asst. Atty. Gen., of counsel), Albany, NY, for plaintiff.

Young Stockli Law Firm (Kevin M. Young, of counsel), Albany, NY, for defendant N. Storonske Cooperage Co., Inc.

Deily Testa Law Firm (Louis J. Testa, of counsel), Albany, NY, for defendant Container Management Corp.

Marc Ehrlich, Trustee of Container Management Corp., Troy, NY.

## MEMORANDUM–DECISION & ORDER

McCURN, Senior District Judge.

### INTRODUCTION

This is an action by the State of New York for cost recovery and equitable relief brought pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* In March, 1994, the State filed a motion for partial summary judgment under Fed. R.Civ.P. 56. More specifically, the State is seeking partial summary judgment "against defendant Container Management Corp[oration] ('CMC'), as the successor corporation to defendant N. Storonske Cooperage Company, Inc. and/or as the operator of a contaminated facility, (1) for liability for the State's response costs pursuant to [CERCLA], and (2) for abatement of a public nuisance pursuant to the New York common law of public nuisance." State's Motion at 1. The defendants N. Storonske Cooperage Company, Inc. and Michael Greenberg, in his capacity as president of that company (collectively referred to throughout as "Storonske"),[1] op-

---

1. Several years after the commencement of this action, in November, 1991 Mr. Greenberg died. Mr. Greenberg's long-time business associates, Harvey Segal and Douglas Rutnik, were named co-executors of his estate. Affidavit of Maureen Leary (Feb. 25, 1994), exh. E. thereto (Deposition of Harvey Segal) at 146–147. After Mr. Greenberg's death, the State moved to amend its complaint to clarify the capacity in which he was named as a defendant. *See State of N.Y. v. N. Storonske Cooperage Co., Inc.,* 144 F.R.D. 179 (N.D.N.Y.1992). In particular, the State sought

pose this motion; and although they argue in opposition, *inter alia,* that "[m]any of the State's alleged response costs are not lawfully recoverable[ ]"[2] under CERCLA, they did not present this argument in the form of a cross-motion.[3] Thus, the only issues before the court at this time are those the State raises pertaining to liability.[4]

Due in large part to several delays resulting from the related bankruptcy proceeding, the court did not hear oral argument on the State's motion until August 1, 1994. Following oral argument, the court reserved decision, indicating that its decision would be forthcoming. The court has now had an opportunity to carefully consider the parties' arguments, as set forth in their respective memorandum of law and as amplified at oral argument, as well as the applicable law in this area. For the reasons set forth herein, the State's motion for partial summary judgment must be granted because CMC is a successor corporation of Storonske.

## BACKGROUND

Just eight months after the incorporation of CMC, on December 4, 1989, Michael

Greenberg, Storonske's president at the time, and the State of New York executed an "Interim Consent Order and Judgment" in this litigation, which was "so ordered" by the court on January 11, 1990 ("the 1990 Judgment"). *See* Leary Affidavit, exh. A. thereto. Two provisions of that judgment are, in the State's view, particularly relevant to this motion. The first is Storonske's admission that from "1973 to the present" it owned or operated a drum recycling facility in the Town of Schodack, Rensselaer County, New York ("the Kraft Road site") where hazardous substances were found in the soils and groundwater. *See id.* at 1, ¶ 1. The second is Storonske's agreement that "it is liable pursuant to 42 U.S.C. § 9607 for response costs incurred or to be incurred by the State not inconsistent with the National Contingency Plan ("NCP") related to the release of the hazardous substance at and from the Site." *Id.* at 2, ¶ 2. It is the State's conviction that the effect of this 1990 Judgment is two-fold. First, it "ended the question of Storonske's liability for the State's response costs under CERCLA" in this action. *Id.* at ¶ 3. Second, the 1990 Judgment imputes liability to

to clarify that Greenberg was being sued in his individual as opposed to his official capacity. *Id.* at 181. Assuming the court would allow such an amendment, the State also sought to substitute as defendants the co-executor of Greenberg's estate. *Id.* The court denied that motion.

2. Memorandum of Law in Opposition to State's Motion for Partial Summary Judgment ("Storonske Memorandum") at 23.

3. CMC also opposes the State's motion, but it does so on procedural grounds pertaining to the related bankruptcy matter, which will be discussed in section I herein. Affidavit of Marc S. Ehrlich (July 27, 1994) at ¶ 3. Insofar as the substantive CERCLA issues raised by this motion, CMC adopts the arguments made by Storonske. *Id.* at ¶ 18. Therefore, all references to Storonske's opposition arguments shall also be read as including CMC.

Although attorney Ehrlich appeared on behalf of CMC at oral argument, the court's docket sheet still indicates that Louis Testa is representing CMC in this action. It is incumbent upon both attorneys Ehrlich and Testa to promptly take whatever action they deem appropriate, keeping in mind Local Rule 83.2, to insure that the court's docket accurately reflects CMC's current counsel of record.

4. The court's decision to treat only the liability issues the State raises on this motion is consistent not only with the procedural posture of the case, but also with the Second Circuit's recognition that in CERCLA cases "[l]iability may be decided first *before* the more complicated questions implicated in clean-up measures, which includes fixing the proportionate fault of liable parties." *See United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 720 (2nd Cir.1993) (citation omitted) (emphasis in original). This approach, the Second Circuit further recognized, "[e]ffectively isolat[es] the issues to be resolved, avoid[ing] lengthy and perhaps needless litigation." *Id. See also Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 667–68, *corrected, clarified, reh'g denied,* 889 F.2d 673 (5th Cir.1989) ("[C]ourts have bifurcated the liability and remedial, or damages, phases of CERCLA litigation.... In doing so, disputed factual and legal issues pertaining only to liability are resolved before deciding the more complicated and technical questions of the appropriate cleanup measures and the proportionate fault of liable parties."). Thus, issues such as whether administrative oversight and monitoring costs are recoverable under CERCLA and the reasonableness of the response costs incurred by the State to date, which are not directly relevant to the liability issue before the court on this motion, must await another day.

CMC as a successor corporation of Storonske. Simply put, the thrust of the State's motion is that the court should find, as a matter of law, that CMC is a successor corporation of Storonske. Storonske disagrees asserting that there is no successor-predecessor relationship between it and CMC.

## DISCUSSION

### I. Bankruptcy Code's Automatic Stay Provision

Before tackling the more difficult issue of successor liability, the court must first consider the effect, if any, of the Bankruptcy Code's ("the Code") automatic stay provision, codified at 11 U.S.C. § 362, upon the present litigation. Resolution of this issue is necessary because, as alluded to earlier, there is a bankruptcy proceeding directly related to this action. Specifically, on April 16, 1993, defendant CMC filed a chapter 11 bankruptcy petition for reorganization. Ehrlich Affidavit at ¶ 4. On August 3, 1993, the State filed an unsecured proof of claim with the bankruptcy court in the amount of one million four hundred twenty thousand dollars ($1,420,000.00). The listed basis for that claim is that CMC is a potentially responsible party in this action.[5] Subsequently, on July 6, 1994, that bankruptcy was converted to a Chapter 7 liquidation proceeding. *Id.* Shortly thereafter, on July 15, 1994, attorney Ehrlich was appointed as CMC's Chapter 7 Trustee. *Id.* at ¶ 5. A meeting of creditors and equity security holders as required under 11 U.S.C. § 341 was scheduled for August 5, 1994, *id.* at ¶ 6; but the court is unaware of whether that meeting actually took place, and if so, what transpired.

■ It is against the backdrop of this related bankruptcy proceeding which the court must consider the Code's automatic stay provision. That provision states in relevant part:

Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, ..., operates as a stay, applicable to all entities, of—

the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; ....

11 U.S.C. § 362(a)(1) (West 1993). As this statute indicates, although perhaps not obviously so, the automatic stay provision is broad, applying to Chapter 7, 11 and 13 bankruptcies. *See Matter of Chicago, Milwaukee, St. Paul & Pac. R.*, 974 F.2d 775, 781 (7th Cir.1992) (citation omitted). Thus, the fact that CMC's bankruptcy has been converted from a proceeding under Chapter 11 to one under Chapter 7 does not, in and of itself, effect the applicability of the automatic stay provision.

Subsection (b) of the automatic stay provision contains a number of exceptions. Two of those exceptions are of particular significance here. The first is section 362(b)(4) which provides that the stay does not operate at "the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power[.]" 11 U.S.C. § 362(b)(4) (West 1993). The second is found in subsection (b)(5) which provides that the stay does not operate when one is seeking "the enforcement of a judgment, **other than a money judgment,** obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power[.]" 11 U.S.C. § 362(b)(5) (West 1993) (emphasis added). Congress enacted these police and regulatory power exceptions to the automatic stay "[t]o combat the risk that the bankruptcy court would become a sanctuary for environmental wrongdoers, among others[.]" *United States v. Nicolet, Inc.*, 857 F.2d 202, 207 (3rd Cir.1988) (citation omitted). "These provisions embody Congress' recognition that enforcement of the environ-

---

5. The copy of the State's claim provided to the court on this motion did not include the attachment which was referenced on the face of the claim form. Therefore, the State, responding to the court's request for the same, provided that attachment to the court and it has now been made a part of the record on this motion.

mental protection laws merits a higher priority than the debtor's rights to a 'cease fire' or the creditors' rights to an orderly administration of the estate." *Id.* (citations omitted).

The State maintains that its motion falls within section 362(b)(4)'s exception to the automatic stay provision "because [this motion] is the continuation of an action pursuant to the State's regulatory and police power under CERCLA and the common law of public nuisance." Memorandum of Law in Support of State's Motion for Partial Summary Judgment ("State's Memorandum") at 51. CMC does not argue against application of this exception, but instead asserts that the State is circumventing the Code by not making a motion in bankruptcy court to lift the automatic stay. CMC further asserts that the determination as to whether CMC is a successor corporation is a "core proceeding" under 28 U.S.C. § 157,[6] and thus should be left to the bankruptcy court to resolve.

■ Before determining the validity of the State's position, the court must consider whether it even has jurisdiction to determine the reach and scope of the automatic stay provision and its several exceptions thereto— an issue not addressed by the parties. The Second Circuit in *In re Baldwin–United Corp. Litigation,* 765 F.2d 343 (2d Cir.1985), answered this question in the affirmative when it unequivocally held that "[t]he court in which the litigation claimed to be stayed is pending has jurisdiction to determine not only its own jurisdiction but also the more precise question whether the proceeding pending before it is subject to the automatic stay." *Id.* at 347 (footnote omitted). By the same token, the *Baldwin* Court did acknowledge that "[w]hether it ought to exercise its authority to make such a determination, ..., is a different question." *Id.* Thus, in *Baldwin*, "[w]hile recognizing that the court in which the litigation claimed to be stayed in pending has jurisdiction to determine the applicability of the automatic stay to that proceeding, the Second Circuit ruled that, under the circumstances of the case before it, the bankruptcy court should be afforded the

opportunity to determine the applicability of the automatic stay provision." *Patterson v. Newspaper & Mail Deliverers' Union,* 138 B.R. 149, 151 (S.D.N.Y.1992). "In concluding that the district court had abused its discretion in issuing the injunction prohibiting the debtor from applying to the bankruptcy court for any relief against any defendant, the *Baldwin* Court emphasized that 'centralizing construction of the automatic stay in the Bankruptcy Court' would result in 'uniformity on issues of law,' and would assist that court's effort to 'assure equality of treatment among creditors.' " *Id.* at 152 (quoting *Baldwin,* 765 F.2d at 349).

In the present case the just quoted concerns identified by the *Baldwin* Court are not implicated, and thus the court finds that it is in the best position to determine whether the police and regulatory exception to the automatic stay provision applies here. Furthermore, given the rather tortuous and protracted history of this litigation, which has been pending for nearly seven years, the court is quite familiar with many aspects of this case, and this factor too weighs in favor of this court, rather than the bankruptcy court, deciding the applicability of the automatic stay provision *See id.* (because of the district court's substantial familiarity and experience with the case, the issue of the applicability of the automatic stay was best left for that court to decide). An additional reason for this court, as opposed to the bankruptcy court, to decide whether the police/regulatory power exception to the automatic stay is relevant in this proceeding is that resolution of that issue involves, in part, construction of CERCLA, a federal statute with which this court has significant working familiarity.

■ Having determined that it may properly exercise its jurisdiction to determine the scope and reach of the Code's automatic stay provision, and the several exceptions thereto, the court is now free to consider the parties' respective positions on this point. Although this issue is an important one, in that it implicates jurisdictional concerns, it may be

---

**6.** Basically that statute sets forth the general jurisdictional parameters conferred on bankruptcy courts, providing, among other things, that such courts may hear all "core proceedings." *See* 28 U.S.C. § 157 (West 1993).

quickly resolved. As the State correctly points out, the Second Circuit in *City of New York v. Exxon Corp.*, 932 F.2d 1020 (2d Cir.1991), expressly held "that governmental actions under CERCLA to recover costs expended in response to completed environmental violations are not stayed by the violator's filing for bankruptcy." *Id.* at 1024 (emphasis added) (citation omitted). In reaching that conclusion, the Court soundly reasoned that "[t]he need to continue such deterrent actions, despite the pendency of a bankruptcy action, furthers the purpose of the regulatory exemption to the automatic stay squarely: to avoid frustrating necessary governmental functions by seeking refuge in bankruptcy court." *Id.* (internal quotation omitted). The Second Circuit's decision in *Exxon* is fully consistent with numerous other courts which have held "that to the extent the United States seeks injunctive relief and fines, the action falls squarely within the section 362(b)(4) exception to the automatic stay." *See United States v. Mattiace Industries, Inc.*, 73 B.R. 816, 818 (E.D.N.Y.1987) (and cases cited therein).[7]

There is one limitation, however, of which the State fails to take account in its memorandum of law, and that is the fact that "[e]ven though governmental police power actions may continue against the debtor, any money judgment [which] might [be] obtain[ed] in such action may not be enforced against the debtor without relief from the automatic stay." *In re New York Trap Rock Corp.*, 153 B.R. 642, 645 (Bkrtcy.S.D.N.Y. 1993). As the court explained in *New York Trap Rock:*

> This is so because the enforcement of money judgments is excluded from the exception expressed in 11 U.S.C. § 362(b)(5). Moreover, 11 U.S.C. § 362(a)(6) specifically stays any act to collect a prepetition claim against the debtor. Thus, such law suits [sic] simply result in liquidating the claim and eliminate the need to establish

or estimate such claim in the bankruptcy court.

*Id.* At oral argument the State readily acknowledged that even if the automatic stay is lifted for purposes of resolving this motion, assuming CMC is still in bankruptcy, that stay will remain in effect in one important respect. More specifically, if eventually the State does obtain a money judgment in this action, because of the stay, it could not engage in any conduct such as executing on the judgment to the detriment of CMC's bankrupt estate. Consequently, with that caveat, the court finds that the present motion falls squarely within section 362(b)(4)'s exception to the Code's automatic stay provision, and so there is no impediment under the Code to considering the State's motion for partial summary judgment. Moreover, there is no need, as CMC urges, for the State to seek to have the automatic stay lifted in the bankruptcy court.

## II. Availability of Successor Liability Under CERCLA

■ Another preliminary issue which the court must resolve is the availability of successor liability under CERCLA. "Successor liability theory is a judicial expression of policy—courts will not permit corporate law formalities to frustrate the larger policies behind substantive rules of liability." *United States v. Atlas Minerals and Chemicals, Inc.*, 91–5118, 1993 WL 482952, at * 3–4, 1993 U.S.Dist. LEXIS 16578, at *8–*9 (E.D.Pa. Sept. 11, 1993) ("*Atlas II* "). As will become evident, this has been especially true in the area of CERCLA litigation, where "courts have expanded successor liability to prevent strategic behavior and evasive actions calculated to avoid CERCLA responsibility." *Id.* at *3, 1993 U.S. Dist. LEXIS 16578, at *10 (citation omitted).

When faced with the issue of the availability of successor liability under CERCLA, the Third Circuit readily acknowledged that "[c]orporate successor liability is neither

---

7. As an aside, as perhaps the parties are aware, several years ago in *Colonial Tanning Corp. v. Home Indem. Co.*, 780 F.Supp. 906 (N.D.N.Y. 1991) (McCurn, C.J.), this court explicitly declined to embrace the police powers argument made in *Exxon* because that case arose in such an obviously different context from *Colonial Tanning*. *Id.* at 925. Nothing in *Colonial Tanning* precludes this court today, however, from applying *Exxon* to a case such as the present one where it is so clearly applicable.

completely novel nor of recent vintage." *Smith Land & Impr. Corp. v. Celotex Corp.,* 851 F.2d 86, 91 (3rd Cir.1988), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989). Quoting the picturesque language of the venerable Blackstone, the Court in *Smith Land* "described the continuing vitality of a corporation[:] '[A]ll the individual members that have existed from the foundation to the present time, or that shall ever hereafter exist, are but one person in law, a person that never dies; in like manner as the river Thames is still the same river, though the parts which compose it are changing every instant.'" *Id.* (quoting 1 W. Blackstone, *Commentaries* * 467–69, quoted in *Polius v. Clark Equip. Co.,* 802 F.2d 75, 77 (3rd Cir. 1986)). In the present case the State asserts, in essence, that Storonske is akin to the Thames River, ever changing, but always remaining the same in one corporate form or another.

This is not the first time that the court has been faced with the issue of the availability of successor liability in this CERCLA action. After listening to argument on the State's motion to amend its complaint to assert, among other things, a claim against CMC on a theory of successor liability, the court noted at that time that "at least three circuits [had held] that successor corporations can be held liable for it's [sic] predecessor's CERCLA violations." Leary Affidavit, exh. W thereto (partial transcript of Sept. 1, 1992 court proceeding) at 18. The court then referenced these cases: *Anspec Co., Inc. v. Johnson Controls, Inc.,* 922 F.2d 1240 (6th Cir.1991); *Louisiana–Pacific Corp. v. Asarco, Inc.,* 909 F.2d 1260 (9th Cir.1990); and *Smith Land.* Since then several other Circuit Courts,[8] as well as numerous district courts,[9] have reached the same conclusion. Although the Second Circuit has not yet had occasion to rule on the issue of whether successor liability is a viable theory of recovery under CERCLA, the court finds persuasive the reasoning of the many courts which have. Thus, this court will follow the prevailing trend and hold that under certain circumstances a successor corporation may be liable under CERCLA. *See Carolina Transformer,* 978 F.2d at 837 (emphasis added) (citing *Louisiana–Pacific,* 909 F.2d at 1263; *Smith Land,* 851 F.2d at 92) ("The national interest in the uniform enforcement of CERCLA and the same interest in preventing evasion by a responsible party ... are the reasons we think the successor liability is appropriate *where factually justified.*").

### III. Applicable Law

■ There is one additional preliminary matter which the court must consider, albeit briefly, before turning to the merits of the State's successor liability argument, and that is whether federal or state law should be applied in analyzing successor liability. This issue was previously raised by the court in connection with the State's motion to amend. The court noted then that "[i]n *Anspec Co.,* the Sixth Circuit directed the district court on remand to apply the successor liability of the forum state, not the 'traditional rules governing successor liability[.]'" Leary Affidavit, exh. W thereto at 22 (quoting *Anspec,* 922 F.2d at 1248). This court went on to observe, however, that "[t]o the extent that the Circuits are divided on whether to apply 'traditional rules' or the forum state's rules, this court need not resolve that dispute ... because the New York rules governing successor liability mirror the 'traditional' rules." *Id.* at 22–23 (citing *Schumacher v. Richards Shear Co., Inc.,* 59 N.Y.2d 239, 464 N.Y.S.2d 437, 440, 451 N.E.2d 195 (1983); and *Santa Maria v. Owens–Illinois, Inc.,* 808 F.2d 848, 856 (1st Cir.1986)).

---

8. *See United States v. Carolina Transformer Co.,* 978 F.2d 832, 837 (4th Cir.1992); and *United States v. Mexico Feed and Seed Co., Inc.,* 980 F.2d 478, 487 (8th Cir.1992); *see also John S. Boyd Co., Inc. v. Boston Gas Co.,* 992 F.2d 401, 404 (1st Cir.1993) (recognizing that "[c]ourts have interpreted [section 9607(a) of CERCLA] to include *successor corporations in a merger situation*").

9. *See Kleen Laundry & Dry Cleaning v. Total Waste Mgt.,* 817 F.Supp. 225, 230 (D.N.H.1993) (*"Kleen Laundry I"*) (and cases cited therein); *cf. B.F. Goodrich Co. v. Murtha,* 840 F.Supp. 180, 184 (D.Conn.1993) (implicitly recognizing the availability generally of successor liability under CERCLA, but declining to find the same under the facts presented).

The court abides by its earlier determination that because New York rules of successor liability so closely parallel the "traditional" rules, it need not conclusively decide whether to apply state law or federal law. Nevertheless, the court notes its agreement with the view that: " 'The national interest in the uniform enforcement of CERCLA and the same interest in preventing evasion by a responsible party by even legitimate resort to state law' commands that CERCLA successor liability be governed by a uniform federal rule of decision rather than by the laws of the individual states." *Atlantic Richfield Co. v. Blosenski,* 847 F.Supp. 1261, 1283 (E.D.Pa.1994) (quoting *Carolina Transformer,* 978 F.2d at 837) (other citations omitted).[10] This approach is consonant with CERCLA's "meager legislative history ... indicat[ing] that Congress expected the courts to develop a federal common law to supplement the statute." *Smith Land,* 851 F.2d at 91 (citations omitted).[11] In light of the foregoing, the court will draw predominantly on successor liability as that concept has evolved in other CERCLA cases, although where appropriate the court will also look to New York successor liability law for guidance.

### IV. Standards for Successor Liability

Wisely, Storonske does not dispute the availability of successor liability under CERCLA. Instead, the focus of Storonske's challenge to the State's motion is that CMC cannot be shown to be a successor corporation of Storonske; or, at the very least, there are genuine issues of material fact precluding a finding on this summary judgment motion that, as a matter of law, CMC is a successor corporation of Storonske. As the ensuing discussion demonstrates, however, for the most part, it is not the facts which are in dispute, but rather the legal significance which they should be accorded.

■■■ It is the general rule in most American jurisdictions,[12] including New York, that "a corporation which acquires the assets of another[13] is **not** liable for the torts of its predecessor[.]" *Schumacher,* 59 N.Y.2d at 244, 464 N.Y.S.2d at 440, 451 N.E.2d at 198 (emphasis added) (citation omitted). There are four "well recognized exceptions"[14] to that rule, however, whereby liability may be imposed on a successor corporation:

> "[I]f [the successor corporation] expressly or impliedly assumed the predecessor's ... liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations."

*Id.* Hedging its bets, the State is seeking to impose successor liability on CMC based upon any or all of those exceptions, as well as for reasons of "equity and fairness." State's Memorandum at 42. Of course, to prevail on this motion, the State need only show that successor liability may be properly imposed based upon any one of those exceptions.

In response to the State's motion, Storonske strenuously maintains that CMC is a corporate entity, wholly separate and distinct from Storonske, and that CMC is most definitely not a successor of Storonske. Storonske contends that the court need not address the applicability of any of the four enumerated exceptions because the State has "ignored" what Storonske believes is the "first step" of this analysis and that is the issue of whether somehow CMC has ob-

---

**10.** *See also, Smith Land,* 851 F.2d at 92 ("The general doctrine of successor liability in operation in most states should guide the court's decision rather than the narrow statutes which might apply in only a few states.").

**11.** *Cf. Mexico Feed and Seed, supra,* 980 F.2d at 487 n. 9 (although not deciding whether federal or state law applies in analyzing successor liability, the Eighth Circuit opined "considering the national application of CERCLA and fairness to similarly situated parties, the district court was probably correct in applying federal law[ ]").

**12.** *See Santa Maria,* 808 F.2d at 856.

**13.** As will be discussed in section IV(A) below, the meaning of this phrase, "acquires the assets of another," is open to interpretation.

**14.** See *Santa Maria,* 808 F.2d at 856 (applying New York law).

tained [15] "**substantially all** of the assets of the seller [Storonske][.]" Storonske's Memorandum at 12 (emphasis added). Relying solely upon *Schumacher*, Storonske then goes on to assert that "[b]ecause the State does not ... show that CMC **purchased** assets belonging to Storonske, there can be no 'successor liability' as a matter of law." *Id.* (emphasis added) (footnote omitted).[16]

Although related, in the court's opinion these are two separate arguments which must be addressed before turning to whether the State can establish successor liability on any grounds. The court will address these arguments in reverse order; that is, it will first determine whether, as Storonske insists, a "sale" or "purchase" of assets is a necessary element of successor liability, such that if no "sale" occurred successor liability may not be imposed as a matter of law. Next the court will examine whether there must be, as Storonske contends, a showing that in whatever manner CMC acquired Storonske's assets, it acquired "all or substantially all" of those assets. Only after these issues are resolved will the court be in a position to consider the various theories of successor liability advanced by the State on this motion.

### A. "Sale" of Assets

■ Storonske strenuously asserts that an actual sale of assets is a necessary predicate to successor liability; in fact, at oral argument Storonske stated that a "transfer of assets is not enough" under *Schumacher*. Thus, because the State readily admits that CMC "paid ... no consideration for these valuable assets [Storonske's customer list, the good will developed for 22 years, and at least $214,000 in cash][,]" Leary Affidavit at ¶ 32 (citation omitted), Storonske contends that the State's motion seeking to attach successor liability to CMC must be defeated. Although not addressed in its memorandum of law, it became clear during oral argument

that the State's position is that successor liability may be invoked even without a sale and concomitant purchase of assets; the State maintains that a transfer of assets will suffice, such as an exchange of a note in the form of an "I owe you."

Apart from presenting opposing interpretations of *Schumacher*, neither Storonske nor the State offers any case law to support their respective positions on this issue. However, the court's research did reveal case law which, although not plentiful, does indicate a willingness on the part of at least a few courts to recognize that so long as there is some form of a "transfer" of assets, a literal "purchase" of assets is not required to establish successor liability. For example, construing Washington state law, the Ninth Circuit in *Stoumbos v. Kilimnik*, 988 F.2d 949 (9th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 190, 126 L.Ed.2d 148 (1993), held that the state supreme court there "would extend liability to transfers other than straightforward purchases." *Id.* at 961. The rationale for this extension of liability, according to the Ninth Circuit, is that "[o]therwise, unscrupulous businesspersons would be able to avoid successor liability and cheat creditors merely by changing the form of the transfer." *Id.* (citations omitted). The Ninth Circuit also noted that indeed "[s]everal states have explicitly included the phrase **or otherwise transfers** in their formulation of the law." *Id.* (emphasis added) (internal quotation omitted) (and cases cited therein). The Court further observed that "Fletcher's *Cyclopedia of Corporations* also suggests that successor liability is not limited to transactions in which the asset transfer is accomplished through purchase." *Id.* (quoting 15 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 7122 (perm. ed. rev. vol. 1990)).

The Ninth Circuit is not alone in this view. Several other Circuit Courts, although not specifically addressing the issue of sale or

---

**15.** At this point the court's choice of the word "obtain" is deliberate because, as will be discussed in section IV(A), there is an issue in this case as to whether a "sale" or "purchase" of assets is a necessary precondition to successor liability or whether something less such as a "transfer" of assets will suffice.

**16.** Interestingly, at this juncture Storonske does not reiterate the purported requirement of "substantially all" assets of the selling corporation.

purchase versus transfer, have strongly implied and in one case held that successor corporation status could be conferred where a "transfer" of assets occurred. *Wheat, First Securities, Inc. v. Green,* 993 F.2d 814, 821 (11th Cir.1993) (emphasis added) (finding no basis for successor liability "subsequent to an asset **transfer,**" implying that something short of an actual sale of assets will do); *Carolina Transformer,* 978 F.2d at 839 (successor liability shown where there was, among other factors, a "transfer" of assets); and *Williams v. Bowman Livestock Equipment Co.,* 927 F.2d 1128, 1132 (10th Cir.1991) (emphasis added) (no successor liability because, among other reasons, there was no asset "sale **or** transfer of all, or substantially all, of Bowman Hydro–Vat's assets to Bowman Livestock").

■ Putting aside for a moment the particular facts of this case, the court concludes that at least in the realm of CERCLA litigation it will take the more expansive view of what will loosely be referred to as the "sale of assets" aspect of successor liability. In other words, the court will not require proof of a sale and concomitant purchase; proof of a transfer of assets as a condition to the imposition of successor liability will suffice. The court does so for several reasons. First, it agrees with the Ninth Circuit's reasoning that limiting successor liability to those situations where a literal purchase of assets is shown would allow "unscrupulous businesspersons" to avoid successor liability by simply "changing the form of the transfer." *See Stoumbos,* 988 F.2d at 961 (citation omitted). A second related reason for taking an expansive view of the "sale of assets" factor is that to do otherwise would seriously undermine the remedial goals of CERCLA.[17] *See Kleen Laundry I,* 817 F.Supp. at 231 (quoting *United States v. Distler,* 741 F.Supp. 637, 642 (W.D.Ky.1990)) ("When the court applies the doctrine of successor liability in CERCLA cases, . . ., the court must do so 'in such a fashion as to further the goals of [CERCLA].' "). Just as a responsible party should not be able to evade CERCLA liability by

"arrang[ing] a merger or consolidation under the laws of particular states which unduly restrict successor liability[,]" neither should that party be able to evade CERCLA liability solely on the basis that a sale of assets did not literally occur. *See Smith Land,* 851 F.2d at 92. In that regard, the court wholeheartedly agrees with approach taken by several courts, and that is that "common sense rather than an overly restrictive look at the corporate transfer[ ]" is appropriate in the CERCLA arena. *Distler,* 741 F.Supp. at 642 n. 4 (discussing *Smith Land, supra* ); *see also Kleen Laundry & Dry Cleaning Services, Inc. v. Total Waste Management, Inc.,* 867 F.Supp. 1136, 1140–41 (D.N.H.1994) (*"Kleen Laundry II"* ).

Third, the court simply disagrees with Storonske's reading of *Schumacher.* Contrary to what Storonske argues on this motion, *Schumacher* does not explicitly state that a sale or purchase of assets must be shown in order to impose successor liability. In fact, when reciting the general rule of non-liability as to successor corporations, the New York Court of Appeals used the far broader phrase "acquires the assets of another." *Schumacher,* 59 N.Y.2d at 244, 464 N.Y.S.2d at 440, 451 N.E.2d at 198 (citations omitted). Finally, as previously alluded to, the trend in CERCLA cases also favors a broad reading of the "sale of assets" component of successor liability. For all of these reasons, the court rejects Storonske's argument that CMC cannot be found to be a successor corporation of Storonske because there may not have been an actual "sale" of Storonske's assets to CMC.

### B. *"Substantially All" Assets*

■ Having determined that it is possible for the State to prevail on this motion even if it is shown that CMC did not purchase outright assets of Storonske, the court still needs to consider Storonske's other argument. Must there be, as Storonske con-

---

**17.** The "two primary goals" of CERCLA, as enumerated by the Second Circuit in *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192 (2d Cir.1992), are: "(1) enabling the EPA [Environmental Protection Agency] to respond efficiently and expeditiously to toxic spills, and (2) holding those parties responsible for the releases liable for the costs of the cleanup." *Id.* at 1198 (citations omitted).

tends, a transfer [18] of all or at least "substantially all" of Storonske's assets to CMC, or will something less suffice? Apparently Storonske believes that *Schumacher* supports the view that a finding of successor liability must be predicated upon a showing that the purchasing corporation purchased "substantially all" of the selling corporation's assets. No such requirement is explicitly found in *Schumacher* though. As already stated, all that *Schumacher* seems to require is that the successor corporation "acquire[ ] the assets" of its predecessor. *See Schumacher,* 59 N.Y.2d at 244, 464 N.Y.S.2d at 440, 451 N.E.2d at 198 (citation omitted). Thus, Storonske's reliance on *Schumacher* is misplaced. At oral argument,[19] the State opined that there is no requirement that "substantially all" of the predecessor corporation's assets be transferred to the successor corporation, but the State did not refer the court to any case authority supporting this assertion. Nor did the State offer an alternative standard for determining what portion of a predecessor's assets must be transferred before successor corporation status may be conferred.

As Storonske pointedly noted at oral argument, however, in *Carolina Transformer,* a CERCLA case heavily relied upon by the State, eventually the predecessor corporation did transfer **all** of its assets to the successor corporation. 978 F.2d at 839. Furthermore, in conducting its own independent research, the court did unearth two cases which bolster Storonske's position that a necessary precursor to the imposition of successor liability is that there must be, at a minimum, a transfer of all or "substantially all" of the selling corporation's assets. In *Long v. AT & T Information Systems, Inc.,* 733 F.Supp. 188 (S.D.N.Y.1990), although not directly addressing the issue, the court stated, "[w]hen a corporation sells **substantially** all of its

assets to another, the purchasing corporation is only liable for the former's liabilities under certain circumstances." *Id.* at 208 (emphasis added). Similarly, in *Bowman Livestock Equipment Co.,* the Tenth Circuit found that because, among other reasons, there was not "a sale or transfer of all, or **substantially all**" of the selling company's assets to the purchasing company, there was no basis for imposing liability upon the latter on a "mere continuation" [20] theory of successor liability. 927 F.2d at 1132 and 1132 n. 4 (emphasis added).

■ In any event, there is no need for the court to determine whether there may be a finding of successor liability when something less than "all or substantially all" of the predecessor corporation's assets are transferred to the successor because, as will be shown below, such a transfer was accomplished in this case. Before leaving this issue, the court observes that given the remedial nature of CERCLA, a lenient reading of the "all or substantially all" requirement is probably justified. As with the "sale of assets" requirement, a strict construction of the "all or substantially all" language would, in all likelihood, thwart the remedial goals of CERCLA; and thus the court does not countenance such an approach.

Assuming *arguendo* that the first step in the court's analysis is to determine whether there was a transfer of all or substantially all of Storonske's assets to CMC,[21] although it is a close call, the court is convinced that the present record supports the finding of such a transfer. The court is hesitant to hold that this approach urged by Storonske is necessarily mandated under existing case law. Generally, as will be seen, in CERCLA cases such as this where there is a potential for successor liability courts have not examined transfer of assets in isolation, but rather it

---

**18.** Obviously Storonske did not use the word transfer, but in light of the court's holding on this issue, from here on out the court will refer to a transfer as opposed to a sale of assets.

**19.** The State did not address this issue in its memorandum of law.

**20.** This theory of successor liability will be more fully discussed herein.

**21.** *See Grand Laboratories, Inc. v. Midcon Labs of Iowa,* 32 F.3d 1277, 1281 n. 5 (8th Cir.1994) (citations omitted) ("Most jurisdictions hold that a prerequisite to the imposition of liability against a transfer or sale of all, or substantially all, the assets of the predecessor to the successor").

has been but one part of a larger picture. For the moment, however, the court is focusing on the transfer of assets to the exclusion of the other factors relevant to determining successor liability because that is the approach so strongly advocated by Storonske; and that is also the manner in which the parties framed their respective positions at oral argument.

In responding to Storonske's argument that the requisite transfer of assets is lacking here, at oral argument the State divided into two categories the assets which in its opinion were transferred to CMC—tangible and intangible assets—and so too will the court. In the former category the State includes the $214,044.00 in cash which Storonske provided to CMC. The record is unclear as to exactly when CMC received this cash from Storonske, although the "Combined Financial Statements" of CMC, Eastern Regional Drum Services, Inc. ("ERD"),[22] and Storonske, dated December 31, 1992, lists $214,814.00 as Storonske's total "current assets." Leary Affidavit, exh. N thereto. Of that amount, $214,044.00 or roughly ninety-eight percent of Storonske's total current assets are listed as being "due from affiliate." [23] Id. On this motion, Storonske does not dispute that this entry represents what it terms a $214,044.99 "loan" from Storonske to CMC. Evidently CMC has never repaid this sum to Storonske; indeed, in the related bankruptcy proceeding Storonske is listed as one of CMC's creditors for that amount. Id., exh. R thereto at 11. Thus, in Storonske's opinion this was nothing more than a business loan between two wholly separate corporate entities.

The flaw in that theory, however, is that when the entire record is carefully scrutinized the court is unable to find any indicia that the transfer of $214,044.00 from Storonske to CMC was, in fact, a loan. There is nothing in the record showing the exchange of a note in return for this cash. Nor is there anything in the record as to whether CMC was required to pay interest to Storonske in connection with this $214,044.00. Indeed, Storonske's interest income as reflected in the 1992 Combined Financial Statement is so insignificant that in all probability its source was not CMC. Likewise, the Combined Financial Statement does not indicate any payment by CMC to Storonske—principle or interest—on that amount. The record also is devoid of any mention as to what would happen in the event of a default by CMC on the payment of that supposed loan.

Furthermore, while the court is not prepared at this juncture to go as far as the State would like and find that this claimed loan was not made in good faith, the court observes that there is no suggestion in the present record that CMC ever repaid any portion of that money to Storonske. Taken together, the court agrees with the State that insofar as the $214,044.00 is concerned, the only reasonable inference is that it was never intended as a loan, but instead was simply a cash infusion to CMC. What is more, as alluded to earlier, the 1992 Combined Financial Statement indicates that this $214,044.00 cash transfer from Storonske to CMC represents a transfer of nearly all of the former's liquid assets. From a strictly business

22. ERD is yet another Michael Greenberg company. This company was incorporated on April 18, 1988, well after the incorporation of Storonske, but just a year before the incorporation of CMC. See Leary Affidavit, exh. M thereto. The stated purpose for which ERD was formed is the exact same purpose for which Storonske was formed, and later for which CMC was formed; and that is, in part:

to conduct the business of manufacturing, reconditioning, buying, selling, exporting and importing barrels, steel drum, fibre containers, casks, hogsheads and kegs of all kinds and for any and every purpose; to acquire by purchase or otherwise the necessary real estate and to erect and maintain thereon such plant or

plants as may be required. To acquire the source of supply of the materials used to operate said cooperage, and buy, sell and generally deal in such material.

Compare id., exh. B thereto with exh. M thereto and with exh. O thereto.

23. Without intending to place too much emphasis on this point, the court finds rather telling the use of the word "affiliate" in this statement. Affiliate is commonly understood as meaning in "close connection as a member or branch[,] closely associated with another[.]" Webster's Ninth New Collegiate Dictionary at 61 (1991). Thus it certainly seems that even Storonske and CMC considered themselves to be closely allied, or at least that their mutual accountant did.

standpoint, it makes no sense that an ongoing business entity would make such a transfer with absolutely no provision for repayment, unless of course there was no concern about repayment because of the close relationship between the two entities.

At oral argument, the State portrayed the proof as to a transfer of equipment (the only other tangible asset identified by the State) from Storonske to CMC as "sketchier." The court disagrees with that characterization, however. CMC's accountant, Harvey Segal, who was also Storonske's accountant,[24] unequivocally testified at his deposition that CMC did not acquire any equipment which "Storonske purchased or owned or used, . . . ." Leary Affidavit, exh. E thereto at 93. Further Mr. Segal plainly testified that "anything that Storonske owned [CMC] did not put into their facility." Id. The reason being, according to Mr. Segal, is that CMC's operation is "entirely different"[25] from Storonske's operation. Id. As the State points out, however, both Storonske and CMC leased vehicles from M.G. Leasing. While on its face this point might seem inconsequential, the court can not overlook the fact that M.G. Leasing owns those vehicles and that M.G. Leasing itself was another corporation of Michael Greenberg and later of his estate. Id., exh. E thereto at 98–100; and 283. Still, in the end, because Segal's deposition testimony (the only proof relied upon by the State on this point) as to equipment transfers does not support the view that Storonske transferred its equipment to CMC, the court declines to so find.

The court must next consider whether the intangible assets to which the State refers,

such as Storonske's customer list and goodwill, were transferred to CMC. During oral argument Storonske attempted to diminish the significance of these two items in terms of their being transferrable assets. The court agrees with the State, however, that there may be assets that are not tangible which are readily capable of being transferred between business entities. See Blosenski, 847 F.Supp. at 1290 (listing as "primary assets," among other things, "goodwill and customer lists"); see also Kleen Laundry II, 867 F.Supp. at 1138–39 (in a CERCLA case the purchase agreement included customer lists among the selling company's operating assets).

In the present case, the State has not pointed to any evidence showing that CMC purchased a customer list from Storonske.[26] Nor is there any proof that such a list was actually transferred from Storonske to CMC. The fact remains, however, that by Mr. Segal's admission CMC's customers are "probably" the same or similar to Storonske's customers. Leary Affidavit, exh. E thereto at 90. The reason for the nearly identical customer base is that "within 120 miles of Albany, there is one drum reconditioning facility." Id. at 91.[27] Apparently that was the situation when Storonske was in the drum reconditioning business and the same is true now that CMC is servicing former Storonske customers. Thus, even though it appears that no customer list per se was transferred between Storonske and CMC, the knowledge as to who those customers were was somehow transferred to CMC because today CMC is,

---

24. Leary Affidavit, exh. E thereto at 94.

25. As will be more fully explained herein, the record evidence simply does not support Mr. Segal's characterization of Storonske and CMC's operations as "entirely different."

26. Rather than offering independent proof of the existence or not of a customer list, Storonske attacks the State's proof on this issue, characterizing it as "inadmissible conjecture" of counsel. Storonske's Memorandum at 13. More specifically, Storonske harshly states that "the State fails to offer one shred of admissible evidence that CMC 'acquired' a customer list or 'goodwill,' and instead relies upon the self-serving affidavit

of counsel." Id. This last statement is a bit disingenuous given the fact that in its memorandum of law Storonske states that "the customer list had little or no market value[,]" and then cites to the affidavits of attorney Young and Henry Segal, neither of which support this assertion, at least not in the paragraphs referenced. Storonske Memorandum at 14. It thus appears to the court that both sides are overstating the nature of the proof on this particular point.

27. In the court's view, this statement by Mr. Segal significantly undermines Storonske's position on this motion that CMC is not in the same business as was Storonske.

concededly, servicing Storonske's former customers.

Insofar as goodwill is concerned, unlike a customer list which is not specifically designated as an asset on the Combined Financial Statement, goodwill is listed as a Storonske asset valued at $7,173 as of December 31, 1989 and as of December 31, 1990. *Id.*, exh. N thereto. Here again, although CMC did not purchase Storonske's goodwill, given the substantial similarity in customer base between the two, the only reasonable inference from this record is that CMC has benefited from Storonske's goodwill, and that the same was transferred from Storonske to CMC.

The final intangible asset which the State claims Storonske transferred to CMC is the employee pool. In that regard, the State notes that CMC employs former Storonske employees, including, for a time, the same bookkeeper. *Id.*, exh. E thereto at 91–92. The State argues that this carryover of employees constitutes an intangible asset in that CMC did not have to spend additional resources on employee training, and the court agrees.

In the end, the court readily concedes that this is not the typical situation where business assets were transferred pursuant to a purchase agreement. Nonetheless, the court is compelled to conclude that Storonske did transfer all or substantially all of its assets to CMC. While that conclusion is perhaps not readily apparent from the foregoing discussion, a finding of a transfer of substantially all of Storonske's assets can certainly be shown by examining the proof conversely. That is, instead of considering, as the court just did, what assets were transferred to CMC, the court will now consider what assets Storonske was left with at the end of the day. Understandably, the discovery in this case was not conducted from that perspective and hence the evidence before the court does not directly address this issue. Nevertheless, from examining the entire record the court is able to discern that Storonske was left with almost no assets. The record is unclear as to what happened to the equipment used by Storonske in its business operations. What the record does show though is

that despite Storonske's protestations that it is not a "defunct" corporation,[28] it has not operated as an ongoing business for several years now.

Furthermore, seemingly, Storonske's only remaining tangible asset of which there is concrete record evidence is the contaminated Kraft Road site which is the subject of this action, and presumably which will not have much market value until it is fully remediated—a process which is not yet complete. Moreover, as previously mentioned, as of December 31, 1992, aside from the $214,044.00 which Storonske transferred to CMC, and which CMC has never repaid, the only other "current" asset listed on Storonske's balance sheet is a mere $770.00. *Id.*, exh. N thereto. When Storonske received nothing from CMC for the transfer of almost ninety-eight percent of its liquid assets, that left it in an extremely vulnerable position *vis-a-vis* its creditors. *See Lumbard v. Maglia, Inc.*, 621 F.Supp. 1529, 1536 (S.D.N.Y.1985) (citation omitted). Consequently, it appears, based on the present record, that for all practical purposes Storonske is a shell corporation. It further appears, taking a "common sense rather than an overly restrictive look at the corporate transfer," that over time Storonske did transfer substantially all of its assets to CMC. *See Kleen Laundry II*, 867 F.Supp. at 1140–41 (quotation and citation omitted).

■ In light of this finding of an asset transfer, under the analytical framework urged by Storonske, the court must next consider the various theories of successor liability advanced by the State. Before doing so, however, the court stresses that due to the remedial nature of CERCLA, it will not adhere strictly to the traditional view of any of those theories. *See id.*, at 1140–41. Instead, the court will follow the approach of a number of other courts and apply a slightly less rigid standard in determining whether "[CMC] is in substance, if not in classic form, the successor to [Storonske]." *Id.* The rationale for this approach is that "[s]trict adherence to the parochial requirements in

**28.** Affidavit of Kevin M. Young (March 14, 1994) at ¶ 11.

CERCLA cases may in some instances conflict with the remedial policies underlying [CERCLA]." *Id.* (quotation and citation omitted).

■ Moreover, as the court in *Kleen Laundry II* so aptly stated, "Th[is] pragmatic approach does not repudiate the factors regularly used to determine questions of corporate successorship under the de facto merger or 'mere continuation' exceptions." *Id.* (and cases cited therein). The court in *Kleen Laundry II* further explained that this pragmatic approach is "guided by the principles behind the application of the successor liability doctrine in CERCLA cases[,]" which have been defined as follows:

Congressional intent supports the conclusion that, when choosing between the taxpayers or a successor corporation, the successor should bear the cost. Benefits from use of the pollutant as well as savings resulting from the failure to use non-hazardous disposal methods inured to the original corporation, its successors, and their respective stockholders and accrued only indirectly, if at all, to the general public.

*Id.* at 1141 (quoting *In re Acushnet River & New Bedford Harbor Proceedings re: Alleged PCB Pollution,* 712 F.Supp. 1010, 1013–14 (D.Mass.1989) (quoting in turn *Smith Land,* 851 F.2d at 92)). Keeping this flexible approach always in mind, the court will at last turn to the several potentially applicable successor liability theories at issue herein.

### 1. "De Facto" Merger

■ The first theory of successor liability suggested by the State on this motion is *de facto* merger.[29] Conceptually, "[a] *de facto* merger is no different . . . from an ordinary

merger, except the fact that there has not been 'compliance with the statutory requirements for a merger.'" *Bowers v. Andrew Weir Shipping Ltd.,* 27 F.3d 800, 806 (2nd Cir.1994) (quoting *Arnold Graphics Indus. v. Independent Agent Ctr.,* 775 F.2d 38, 42 (2d Cir.1985)) (other citation omitted). The Second Circuit in *Arnold Graphics* identified the following four factors as relevant in determining whether a *de facto* merger has occurred:

[c]ontinuity of the selling corporation, evidenced by the same management, personnel, assets and physical location; a continuity of stockholders, accomplished by paying for the acquired corporation with shares of stock; a dissolution of the selling corporation, and the assumption of liabilities by the purchaser.

775 F.2d at 42 (quoting *Ladjevardian v. Laidlaw–Coggeshall, Inc.,* 431 F.Supp. 834, 838 (S.D.N.Y.1977)). Courts have not prioritized these factors and indeed "[i]t is not necessary to satisfy all of these factors to find a merger; rather, these factors are only indicators that tend to show a *de facto* merger." *Diaz v. South Bend Lathe Inc.,* 707 F.Supp. 97, 100–101 (E.D.N.Y.1989) (citations omitted); *see also Kleen Laundry II,* 867 F.Supp. at 1139–40 (quoting *Acushnet River,* 712 F.Supp. at 1015) ("While all of these factors favor the finding of a de facto merger, 'no one of these factors is either necessary or sufficient to establish a de factor merger.'"). The State vigorously contends that an examination of each of the *Arnold Graphics* factors in light of the current record demonstrates that there was a *de facto* merger of Storonske and CMC. And, as such, the State contends that CMC, as the

29. This is not the first time the State has advanced a *de facto* merger theory before the court. It did so when moving to amend its complaint to include CMC in September, 1992. By way of background, at that time the court indicated, without deciding, that the "State ha[d] presented ample evidence to suggest that a de facto merger has occurred which would subject [CMC] to successor liability." Leary Affidavit, exh. W thereto at 25. In reaching that conclusion, this court opined that "[t]he presence of common ownership is crystal clear: Greenberg was the sole shareholder of both companies until his death,

after which his widow apparently assumed ownership of [CMC] and his co-executors assumed ownership of Storonske [sic]." *Id.* The court also pointed out that "by undertaking the identical business as operated by Storonske [sic] in the same region of the state and servicing many of the same clients, [CMC] has arguably assumed Storonske's [sic] ordinary business operations." *Id.* But, even in light of the foregoing, the court was careful to "reiterate at this juncture that [it] does not speak to the merits of the State's successor liability claim." *Id.* at 25–26.

surviving corporation, is liable for the claims against the predecessor corporation, Storonske—namely, Storonske's liability arising out of the 1990 Judgment in this case.

### a. Continuity of Enterprise

█ The first inquiry under the *de facto* exception centers on identity of management, personnel, assets and physical location; this is sometimes collectively referred to as "continuity of enterprise." *HRW Systems v. Washington Gas Light Co.*, 823 F.Supp. 318, 334 (D.Md.1993) (quotation and citation omitted). Although Dona Greenberg, Michael Greenberg's wife at the time, was initially the sole shareholder in CMC,[30] when they began experiencing marriage difficulties, slightly more than a year later, they executed an agreement whereby Mr. Greenberg became CMC's sole shareholder, as he was for Storonske. Consequently, the estate of Michael Greenberg now includes not only one hundred percent of the shares in Storonske, but also one hundred percent of the shares in CMC. Leary Affidavit, exh. E thereto at 64 and 103. When Ms. Greenberg relinquished her stock ownership rights in CMC, she also resigned as a director and officer of CMC and in her place Mr. Greenberg became CMC's president. *Id.* at 65. Even before then, however, when Ms. Greenberg was still the sole shareholder, Mr. Greenberg acted in an advisory capacity to CMC.

CMC also has some employees in common with Storonske, although Mr. Segal was unable to give many specifics at his deposition, such as exactly how many of CMC's current twenty employees are former Storonske employees. *See id.* at 91–92. For a time, as previously noted, CMC had the same bookkeeper as Storonske. *Id.* at 92. In addition to sharing the services of Mr. Segal as an accountant, CMC and Storonske also shared the services of attorney Douglas Rutnik. *Id.* at 64–65; and 94.

The proof in the record as to similarity of assets has already been reviewed in quite some detail in discussing the asset transfer.

To reiterate, CMC's customer base is nearly identical to that once served by Storonske. In addition, with respect to continuity of physical location, prior to moving to a new facility at 380 Hudson River in April, 1992, CMC was operating out of the contaminated site at 6 Kraft Road—the site which is the subject of this litigation and out of which Storonske operated for a number of years. *Id.* at 185 and 186. Therefore, Storonske and CMC both operated out of the same facility at the contaminated Kraft Road site for approximately two years.

### b. Dissolution

To support its claim that Storonske is dissolved the State relies primarily upon the affidavit of Benjamin Conlon, a Senior attorney with DEC. *See id.*, exh. P thereto. Attorney Conlon avers that "On or about May 21, 1991, Storonske ceased operating as a drum sales and reclamation business." *Id.* at ¶ 14. He further avers that "Storonske abandoned the contaminated Kraft Road property...." *Id.* Finally, he avers that "[a]t about the same time that Storonske ceased operating, CMC began operating as a drum sales and reclamation business at 380 Hudson River Road...." *Id.* These averments are based upon his review of the CMC financial statements, the Chapter 11 petition and schedules filed by CMC, and Segal's deposition testimony. *Id.* at ¶ 2. Even so, the court has some reservations as to whether these statements by attorney Conlon would satisfy the personal knowledge requirement of Fed.R.Civ.P. 56(e).[31]

By the same token, however, Storonske does not challenge the veracity of these statements. In any event, Storonske's dissolution is evidenced by other proof in the record which does not have the potential for conflicting with Rule 56. More particularly, the December 31, 1992 Combined Financial Statement plainly states that "[S]toronske has abandoned its facility in Schodack, New York, as of December 31, 1992," because this lawsuit "will result in the property having no value." *Id.*, exh. N thereto.

---

30. Leary Affidavit, exh. E thereto at 60 and 64.

31. That rule requires, among other things, that "[s]upporting and opposing affidavit ... be made

on personal knowledge,...." Fed.R.Civ.P. 56(e).

To further support its contention that Storonske is dissolved, the State relies upon the fact that in 1993 Storonske advised the State that it was no longer financially able to provide quarterly sampling of residential drinking water supplies. *Id.* at ¶ 53, and exh. X thereto. Shortly after that, Storonske again advised the State that due to a lack of funds it could no longer pay for bottled drinking water provided to homeowners in the vicinity of the contaminated site, as it had previously agreed to do. *Id.* Based upon all of the foregoing, the State astutely observes that, "[a]lthough Storonske has not liquidated and dissolved, it is only because there is nothing left to liquidate." State's Memorandum of Law at 25. The court is forced to agree. Although at this point the court does find that Storonske, for all practical purposes, is a dissolved corporation in all but form, the court is aware that from the present record it does appear that Storonske did continue operating, in some fashion, for a time after the incorporation of CMC. Under some circumstances, this continuation of the predecessor's business might bar a finding of corporate successorship under the *de facto* merger exception; but "such a formalistic distinction has little bearing on this court's common sense analysis." *See Kleen Laundry II,* 867 F.Supp. at 1142 (citations omitted). Thus, the court finds that this prong of the *de facto* merger exception is also satisfied.

### c. Assumption of Liabilities

The State's proof with respect to CMC's alleged assumption of Storonske's liabilities is far less compelling than the proof as to the factors just discussed. Relying upon CMC's bankruptcy schedule of creditors, the State maintains that CMC assumed at least some of Storonske's liabilities. The problem, which became even more evident at oral argument, is that that schedule lists only CMC's creditors, along with the status of the various claims, such as whether they are liquidated or contingent. Leary Affidavit, exh. R thereto. There is simply no way to discern from the face of that schedule whether any of CMC's creditors are in fact creditors of Storonske.

At oral argument, the State strenuously argued that CMC did assume Storonske's liabilities because, for example, Adirondack Environmental is listed on the schedule as a creditor of CMC. According to the State, the only plausible explanation for that listing is that Adirondack Environmental did cleanup work at the contaminated site, and because there is no contamination at CMC's new site, CMC assumed Storonske's liabilities. Furthermore, during oral argument counsel for the State informed the court that some of CMC's creditors listed on that schedule advised her that they believe that they are owed money by Storonske and not CMC. While the State's theory carries some weight, given the record as it is presently constituted on this issue, the court cannot endorse the State's view of CMC's bankruptcy schedule. (Obviously it would be improper for the court to consider, on this summary judgment motion, counsel's interpretation of this bankruptcy schedule.) Consequently, the court is unable to find, based upon the record before it, that CMC assumed the liabilities of Storonske.

### d. Continuity of Stockholders

Until now the court has deliberately not discussed the continuity of shareholders element of a *de facto* merger. "This factor questions whether shareholders of the predecessor become, at the time of the sale of assets, shareholders of the successor corporation." *Diaz,* 707 F.Supp. at 101 (citation omitted). "Usually, this is accomplished by compensating the predecessor shareholders with stock of the successor." *Id.* (citations omitted). Interestingly, "[s]everal courts have held that continuity of shareholders is critical to a finding of *de facto* merger." *See Allied Corp. v. Acme Solvents Reclaiming, Inc.,* 812 F.Supp. 124, 128 (N.D.Ill.1993) (and cases cited therein); *see also HRW Systems,* 823 F.Supp. at 334 n. 18 (acknowledging that at least one court has found "that the most critical element in the [*de facto* merger] analysis is continuity of ownership.").[32]

---

**32.** *Cf. Nichols v. Roper–Whitney Co.,* 843 F.Supp. 799, 803 (D.N.H.1994) (quotations omitted) (emphasis added) ("One of the **key requirements** for

Adopting that view, Storonske contends that because there was no stock transfer, as a matter of law, there can be no finding of a *de facto* merger of Storonske and CMC. This is the only opposition Storonske offers to the State's *de facto* merger argument. In making this argument Storonske is ignoring that, as already highlighted, "it is not necessary to satisfy **all** of these factors to find a [*de facto* ] merger...." *Diaz*, 707 F.Supp. at 100–01. In fact, in *HRW Systems*, the court soundly reasoned that "[b]ecause the theory of de facto merger is equitable in nature, no one of these factors alone is sufficient to establish successor liability, nor does the absence of just one of these factors disqualify a finding of successor liability." 823 F.Supp. at 334 (citation omitted). Thus, even if the court were to agree with Storonske that no continuity of shareholders can be shown here because of the lack of a stock transfer, given the other proof just discussed which supports the finding of a *de facto* merger, the lack of such a transfer, would, in the court's opinion, be insufficient to overcome the State's *de facto* merger argument.

In addition, Storonske relies upon *Louisiana–Pacific*, to support its position that lack of continuity of shareholders completely undermines a finding of *de facto* merger. The court does not read *Louisiana–Pacific* as narrowly as Storonske seems to, however. True, in that case the Ninth Circuit did find that "[n]o stock ... was exchanged as part of the sale[,]" and thus "the district court did not err in finding that the asset purchase was not a de facto merger." *Louisiana–Pacific*, 909 F.2d at 1265. In footnote 5 of that case, however, the Court pointed out that in *Atlas Tool Co., Inc. v. Commissioner*, 614 F.2d 860 (3rd Cir.), *cert. denied*, 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980), the Third Circuit held that where "one man owned all the stock in both the selling and purchasing corporations[,] ... continuity of shareholder

interest was met **automatically.**" *Id.* at 1264, n. 5 (emphasis added).

In the present case, except for a relatively short span of time when Ms. Greenberg, Michael Greenberg's wife, was the sole shareholder in CMC,[33] that is what occurred here: Michael Greenberg owned all the stock in Storonske—the predecessor corporation, and he later owned all of the stock in CMC— the claimed successor corporation. Now, all of the shares of both corporations are assets of Mr. Greenberg's estate. In the court's opinion, to allow Ms. Greenberg's status as the initial sole stockholder in CMC to defeat a finding of continuity of shareholders, would, under the particular facts of this case, be exalting form over substance.

Furthermore, given the familial relationship between the Storonske and CMC stockholders, there certainly was at least "some continuity of shareholders," and that is all that several courts have required. *See Nichols*, 843 F.Supp. at 804 (finding a *de facto* merger where, among other things, there was "some continuity of shareholders through each of [the defendant corporation's] incarnations"); *Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1458 (11th Cir. 1985) (for a *de facto* merger "at the very least there must be some sort of continuity of the stockholders' ownership interests"). Harvey Segal, continued as CMC's secretary, as he had been since its incorporation. Leary Affidavit, exh. E thereto at 64–65. Moreover, although it does not specify by shares, in the December 31, 1990 "Notes to Combined Financial Statement," it states that "[t]he combined group of companies [CMC, Storonske and ERD] is related to MG Leasing Co ... through common majority ownership and control." *Id.*, exh. N thereto. This note is repeated at a later point in this same document.

a merger under traditional corporation law doctrine is continuity of shareholders[.]'").

**33.** Ms. Greenberg's lack of business experience in the drum reconditioning business, combined with the fact that Mr. Greenberg acted in an advisory capacity to CMC during the relatively short time she was CMC's president and sole stockholder suggest that she was a passive stock-

holder and a corporate officer in name only. Further credence to this view can be found in the fact that when the Greenbergs began experiencing marital difficulties, Ms. Greenberg apparently did not hesitate to relinquish all of her CMC stock, as well as her position as corporate officer. Leary Affidavit, exh. E thereto at 64–65.

■ Finally, with respect to the stock transfer element of continuity of stockholders, the court agrees with the view expressed by Judge McLaughlin in *Diaz* that:

The consuming public should not be frustrated merely because the stock ownership of a corporation has not changed while all else—employee, product, supervision, and plants—are transferred to a successor who continues the business.

707 F.Supp. at 101 (citation omitted). Although *Diaz* was a product liability case, similar concerns are present in this CERCLA action. To reiterate, as the Third Circuit so cogently stated in *Smith Land* while discussing the availability generally of successor liability under CERCLA:

Congressional intent supports the conclusion that, when choosing between the taxpayers or a successor corporation, the successor should bear the cost. Benefits from use of the pollutant as well as savings resulting from the failure to use non-hazardous disposal methods inured to the original corporation, its successors, and their respective stockholders and accrued only indirectly, if at all, to the general public.

*Smith Land*, 851 F.2d at 92. For all of these reasons, the court is not persuaded by Storonske's argument that the lack of a stock transfer mandates the conclusion that Storonske and CMC did not merge. Indeed, when the entire record is carefully examined in light of the *Arnold Graphics* factors, the court has no doubt that a *de facto* merger did occur between Storonske and CMC.

### 2. "Mere Continuation"

Having already found that CMC falls within the *de facto* merger exception to successor liability, the court could end its analysis here. However, because the parties addressed in some depth several other potential theories of successor liability, and because, as will be seen, a couple of those theories are remarkably similar to the *de facto* merger theory just analyzed, the court will briefly address those other theories as well.[34] The State next contends that CMC is but a "mere continuation" of Storonske. The State refers to "mere continuation" and "continuity of enterprise" interchangeably. *See, e.g.,* State's Memorandum at 28 and 30. That is not quite accurate, however. Continuity of enterprise, or "substantial continuity"[35] as it is sometimes called, actually **expands** the scope of the mere continuation exception. *United States v. Atlas Minerals and Chemicals, Inc.,* 824 F.Supp. 46, 49 (E.D.Pa.1993) (and cases cited therein). Thus, even though the State analyzed these two doctrines in conjunction, the court will separately analyze them.

■ In *Carolina Transformer,* the Fourth Circuit recognized that traditionally the "rule with regard to the 'mere continuation' exception is that a corporation is not to be considered the continuation of a predecessor unless, after the transfer of assets, only one corporation remains, and there is an identity of stock, stockholders, and directors between the two corporations." 978 F.2d at 838 (citation omitted). There the Court observed that the entity upon which the government was seeking to impose CERCLA successor liability could not be found to be a successor corporation "under th[at] traditional approach because there was no overlap of stock ownership[.]" *Id.* In a similar vein, because Storonske survived as a "distinct, albeit meager, entity"[36] for approximately two years after the incorporation of CMC, the State is not entitled to rely upon the traditional "mere continuation" theory of successor liability. *See Howard v. Clifton Hydraulic Press Co.,* 830 F.Supp. 708, 710

---

**34.** In this regard, the court finds particularly apropos Judge Glasser's observation in *United States v. Gambino,* 835 F.Supp. 74 (E.D.N.Y. 1993): "If I were more mindful of Francis Bacon's admonition that 'an overspeaking judge is no well-tuned cymbal' and wise enough to heed it, I would say no more. Being neither sufficiently wise nor obedient, I venture to make some additional observations." *Id.* at 89 (footnote omitted).

**35.** *See Blosenski, supra,* 847 F.Supp. at 1284 (referring to the Fourth Circuit's "substantial continuity" approach to CERCLA successor liability).

**36.** *See Schumacher,* 59 N.Y.2d at 245, 464 N.Y.S.2d at 440, 451 N.E.2d at 198.

(E.D.N.Y.1993) ("mere continuation" exception inapplicable where predecessor corporation survived purchase by the alleged successor); *Diaz*, 707 F.Supp. at 100 ("If the predecessor corporation continues to exist after the transaction, in however gossamer a form, the mere continuation exception is not applicable.").[37]

### 3. "Continuing Enterprise" or "Substantial Continuity"

Recognizing that the application of the traditional "mere continuation" exception of successor liability had the potential for thwarting the goals of CERCLA, the "continuing enterprise" or "substantial continuity" exception evolved in the CERCLA arena, as well as in other areas of the law.[38] As will become readily apparent, this theory of successor liability is not unlike the *de facto* merger theory analyzed above, in that some of the factors to be considered are nearly identical to those already discussed with respect to the *de facto* merger theory. "Indeed, the similarity of these two tests has prompted one court to refer to the difference between them as more apparent than real." *HRW Systems*, 823 F.Supp. at 334 n. 17 (citation omitted) (internal quotation omitted).[39]

 In any event, "[i]n determining whether one corporation is the successor to another[ ]" under this theory, the Fourth Circuit in *Carolina Transformer* listed a number of factors to be considered:

(1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production

facilities in the same location; (4) production of the same product; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operations; and (8) whether the successor holds itself out as the continuation of the previous enterprise.

978 F.2d at 838 (citations omitted). In addition to those factors, the Court in *Carolina Transformer* also declared that if improper intent was present, as it was in that case, that too is a factor which may be considered. More particularly, the Court astutely stated: "If the transfer to the new corporation was part of an effort to continue the business of the former corporation yet avoid its existing or potential state of federal environmental liability, of course that should be considered...." *Id.* (citation omitted).

There is, however, a significant limitation on the applicability of this "continuity of enterprise" exception; it "only applies when it has been shown that the asset purchaser has knowledge of the potential liability and responsibility for that liability." *Allied Corp.*, 812 F.Supp. at 129 (citing *Mexico Feed and Seed*, 980 F.2d at 488). Thus, in the present case, before considering the many factors enumerated by the *Carolina Transformer* Court, this court will first address whether the present record supports a finding that CMC had knowledge of Storonske's potential CERCLA liability, and whether CMC is responsible for that liability. Only if the court finds both of those elements exist will it go on to consider the multi-factor test set forth in *Carolina Transformer.*[40]

---

**37.** *See also id.* (predecessor corporation "must be extinguished" before "mere continuation" exception may be invoked).

**38.** The court is fully aware that the New York Court of Appeals in *Schumacher* left open the issue of the availability of this "continuing enterprise" theory of successor liability. *See* 59 N.Y.2d at 245, 464 N.Y.S.2d at 440, 451 N.E.2d at 198. "As a result of this indecision, lower New York courts have split as to whether these doctrines have been rejected." *Diaz*, 707 F.Supp. at 103 n. 1 (and cases cited therein). At the risk of sounding repetitive, however, given the broad remedial purpose of CERCLA, this division among New York courts does not deter this federal district court from finding that, where factually justifiable, the "continuing enter-

prise" theory of successor liability does have a place in CERCLA litigation. By no means is the court suggesting though that this theory may be invoked under New York law in a context other than CERCLA; obviously that is a decision for the New York courts and/or lawmakers.

**39.** *But see Grand Laboratories, Inc. v. Midcon Labs of Iowa Corp.*, 32 F.3d at 1283 (quoting *Florom v. Elliott Mfg.*, 867 F.2d 570, 578 n. 3 (10th Cir.1989)) ("[T]he continuity of enterprise exception is 'significantly different' from the mere continuation exception.")

**40.** The court recognizes that in *Blosenski* the court opined that requiring knowledge or actual notice of the predecessor corporation's potential CERCLA liability is "improper" because "it 'sug-

■ The only reasonable inference in this case is that CMC corporate officers, Michael Greenberg and Harvey Segal in particular, knew full well of Storonske's CERCLA liability. As mentioned at the outset, the undisputed facts show that a mere eight months after the incorporation of CMC, in December, 1989, Michael Greenberg, in his capacity as Storonske's president, executed the consent judgment in this action which essentially affixes liability on Storonske for the contamination at the Kraft Road site. Furthermore, the combined Financial Statements for 1990, 1991, and 1992, prepared by accountant and corporate officer Segal, "note" several times, under the heading "contingencies," that Storonske is a defendant in this action; and later in 1992 it notes that CMC has also been named as a defendant as a "successor corporation." *See* Leary Affidavit, exh. N thereto. Thus, especially given the overlap in corporate officers, the court is convinced that CMC had the requisite knowledge of Storonske's CERCLA liability.

■ Likewise, because for a time CMC also operated out of the contaminated Kraft Road site, and because Storonske and CMC were conducting substantially the same type of drum reconditioning business, the court further concludes that CMC is also responsible for Storonske's liability. This finding is bolstered by the "substantial and continuous" ties between Storonske and CMC, which pervade this record. *See Atlas II,* 1993 WL 482952, at * 3, 1993 U.S. Dist. LEXIS 16578, at *10 (citations omitted). When those ties exist, the *Atlas II* court opined that "a court might be able to infer that the successor is indeed a 'responsible party' under CERC-

LA." *Id.* The court is not prepared either in this action or at this juncture to find that CMC necessarily falls within CERCLA's definition of a "responsible party,"[41] but the court does believe, based upon the totality of the circumstances, that the inference is very strong.

■ At last the court is free to examine the numerous *Carolina Transformer* factors which are relevant to determining whether CMC is a "continuing enterprise" of Storonske. Because some of these factors overlap those previously addressed in preceding *de facto* merger section, the court will not belabor those common factors. Instead the court will examine only those factors which until now have not been the focus of the court's inquiry.

The court has not yet examined whether Storonske and CMC produced the same product. Mr. Segal testified that they did not, but the proof belies his assertion that CMC's operation is "entirely different" from Storonske's former operation. *See* Leary Affidavit, exh. E thereto at 93. First of all, a comparison of the certificates of incorporation for those two companies reveals, as already noted, that they were incorporated for the identical purpose—drum sales and reconditioning. *Compare id.,* exh. B thereto *with* exh. O thereto. Second, Mr. Segal did concede at his deposition that both Storonske and CMC wash drums. *Id.,* exh. E thereto at 60. They also both recondition and paint drums.[42] Third, because CMC serves Storonske's former customers, it is reasonable to infer that CMC is in substantially the same line of business as was Storonske.[43] The fact

gests that the theory ought to be applied only when there is a causal link between the CERCLA defendant and the environmental harm.' " 847 F.Supp. at 1287 (quoting *Atlas I,* 824 F.Supp. at 51 (citing in turn *Polius v. Clark Equipment Co.,* 802 F.2d 75 (3rd Cir.1986))). This court too is inclined toward that view, especially given the Second Circuit's recognition that "a causation requirement is at odds with the basic structure of CERCLA's definition of responsible parties." *Id.* at 1285 (referring to *State of New York v. Shore Realty,* 759 F.2d 1032, 1044 (2d Cir.1985)). However, because as set forth above, the court finds that the record presently before it shows that CMC did have knowledge of Storonske's potential CERCLA liability, the court need not decide today the exact parameters of

when the "substantial continuity" test should be applied. *See id* at 1287, and n. 26 thereon.

**41.** *See* 42 U.S.C. § 9607(a)(1)–(4) (West Supp. 1994).

**42.** Obviously in Storonske's case, these are activities in which it formerly engaged, but that it no longer does.

**43.** One additional fact which does not weigh heavily in the court's analysis on this point, but is noteworthy, and that is the indication in the Combined Financial Statement that Storonske and CMC, as well as Michael Greenberg's other related companies, "obtain all new steel drums

that Storonske was, in Mr. Segal's words, in a "very restrictive situation," in that it only had the capability to recondition certain kinds of drums, and that because of a "different process," CMC is now able to recondition "more different types of drums," does not change the court's opinion that for all intents and purposes, CMC is in the same line of business as was Storonske.

Obviously there was no retention of the same name in this case, but there was a continuity of general business operations. In addition to the evidence already outlined supporting this proposition, the court emphasizes that CMC services Storonske's former customers. *See, Kleen Laundry II,* 867 F.Supp. at 1142 (citation omitted) ("Perhaps most significantly, the defendant assumed Portland Oil's customers and serviced them without interruption with the same drivers and trucks but under the TWM name."). The record proof is inconclusive, however, as to whether CMC holds itself out as the continuation of Storonske. As earlier explained, the State's reliance on CMC's bankruptcy schedule of creditors is insufficient, in and of itself, to show that CMC assumed Storonske's liabilities.

There is one final factor which the court will consider, in accordance with *Carolina Transformer,* and that is intent. In that regard, the court believes that CMC's move in 1991 from the contaminated Kraft Road site to 380 Hudson River Road was, just like *Carolina Transformer,* "an apparent attempt by those controlling [Storonske and CMC] to distance themselves both physically and legally, from the ... contaminated [Kraft Road] site. *See Carolina Transformer,* 978 F.2d at 841. Viewing the entire record, not discretely, but as a whole, the only reasonable inference is that the transfer of Storonske's customer base, among other things, to CMC, combined with the fact that Storonske is no longer operating and has not been for several years, is that this was all part of an effort "to continue the business [of Storonske] in all material respects yet avoid

the environmental liability arising from the [contaminated Kraft Road site]." *See id.* Thus, for all of these reasons, the court is convinced that the present record also supports a finding of "continuing enterprise" or "substantial continuity" between Storonske and CMC.

### 4. *Implied Assumption of Liability*

The State's next theory of successor liability is premised upon its belief that "CMC impliedly assumed Storonske's liabilities, including its liability for the State's response costs." State's Memorandum at 34. Storonske acknowledges that CMC did make "certain payments regarding the Kraft Road site to contractors," but, asserts Storonske, "there is no evidence presented by the State of the reasons behind such payments or that such payments were intended in any way to bind CMC to debts of Storonske." Storonske Memorandum at 15–16. Storonske makes one additional argument against this implied assumption of liability theory and that is that the State, in direct contravention of Fed.R.Evid. 408,[44] has improperly relied upon the fact that CMC has conducted settlement negotiations with the State in connection with this litigation.

In *Ladjevardian* the court explained that "[w]hile no precise rule governs the finding of implied liability, the authorities suggest that the conduct or representations relied upon by the party asserting liability must indicate an intention on the part of the buyer to pay the debts of the seller." 431 F.Supp. at 839 (citation omitted). Whether such intention exists "depends on the facts and circumstances of each case." *Id.* There the court also recited two specific factors to be considered in determining whether a successor corporation impliedly assumed the liabilities of its predecessor. The first factor "is the effect of the transfer upon creditors of the predecessor corporation." *Id.* (citations omitted). The second factor is "[a]dmissions of liability on the part of officers or other

---

from one source." Leary Affidavit, exh. N thereto.

**44.** In general, this Rule prevents introduction of evidence of compromise and evidence of offers to compromise "to prove liability for or invalidity of the claim or its amount." Fed.R.Evid. 408.

spokesmen of the successor corporation...."
*Id.* at 840.

The State relies upon two pieces of documentary evidence to support its theory of implied assumption of liabilities. First, it relies upon CMC's bankruptcy schedule of creditors, which, as previously mentioned, understandably, does not on its face appear to distinguish between creditors of CMC and creditors of Storonske; and, in fact, given the nature of document, why should it? *See* Leary Affidavit at ¶ 34 and exh. R thereto. Second, it relies upon the 1992 "Combined Financial Statements" of CMC, ERD and Storonske. *See id.*, exh. N thereto. However, because the court has just determined that CMC may be liable as a successor corporation under either or both the *de facto* merger or "continuing enterprise" theories, it need not consider this alternative theory of liability. The court opines, without deciding though, that a finding of implied assumption of liability is probably precluded because the record is not complete as to the effect of the transfer from Storonske to CMC on the former's creditors.

### 5. Fraudulent Transaction

 The penultimate theory of successor liability urged by the State is that Storonske's assets were fraudulently conveyed in violation of New York's Debtor and Creditor Law ("DCL"),[45] with intent to avoid liability to the State in this CERCLA action. Storonske counters that the State did not even plead this fraud based theory with sufficient particularity as Rule 9(b) requires.[46] Summary judgment on a fraud claim of any kind is exceedingly rare due to the intent element, which, is almost always an issue of fact. *See Golden Budha Corp. v. Canadian Land Co. of America*, 931 F.2d 196, 201–02 (2d Cir.1991) (citation omitted) ("Ordinarily, the issue of fraudulent intent cannot be resolved on a motion for summary judgment, being a factual question involving the parties' states of mind."). After reviewing the State's fraud argument and the evidence with respect thereto, this case seems no different; that is, summary judgment is not appropriate on this theory of successor liability.

### 6. "Equity and Fairness"

Finally, the State contends that even if the court is not convinced that CMC is Storonske's successor under any one of the theories discussed above, "concepts of equity and fairness compel a finding of successor liability." State's Memorandum at 42. To support this contention, the State relies upon the remedial nature of CERCLA and the fact that without successor liability, the State will have no remedy "because Storonske has been made penniless by CMC's management which is identical to Storonske's." *Id.* at 43. Given that the court has found that CMC is a successor corporation to Storonske, it need not and will not engage in an analysis of this policy argument. *See HRW Systems*, 823 F.Supp. at 336 (declining to decide whether a *de facto* merger had occurred based on "social policy" considerations where the facts before the court made it possible for the court to decide that a *de facto* merger had occurred, irrespective of "social policy" consideration).

To summarize, the court holds that CMC comes within the *de facto* merger and/or "continuing enterprise" exceptions to the

---

**45.** In particular, the State maintains that Storonske's assets were fraudulently conveyed to CMC within the meaning of section 273–a of the DCL, which reads as follows:

> Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.

N.Y. Debt. & Cred. § 273–a (McKinney 1990). The DCL defines "fair consideration" as follows:

> Fair consideration is given for property, or obligation,
> a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
> b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

N.Y. Debt. & Cred. § 272 (McKinney 1990).

**46.** That rule requires, *inter alia*, that fraud be "stated with particularity." Fed.R.Civ.P. 9(b).

general rule against successor liability; and so the State's motion for partial summary judgment is granted in that respect. The State's motion is denied, however, insofar as it is premised upon the theories of "mere continuation," implied assumption of liabilities, fraudulent conveyance, and "equity and fairness."

### V. Res Judicata and Collateral Estoppel

 Once the court finds that CMC is Storonske's successor, the State next asserts "CMC is barred from challenging the 1990 Judgment by the doctrines of res judicata and collateral estoppel." State Memorandum at 43. Storonske did not address this issue, either in its memorandum of law, or at oral argument. The court will treat Storonske's silence as acquiescence. In other words, because Storonske failed to challenge the State's *res judicata* and collateral estoppel arguments, the court concludes that CMC, as a successor corporation to Storonske, is bound by the 1990 Judgment in this case insofar as liability is concerned. Issues still remain open, however, as to damages.

### VI. CMC as Site Operator

Not wanting to leave any stone unturned, the State argues alternatively that in the event the court finds that CMC is not Storonske's successor, CMC may still be held liable for the State's response costs and for abatement of a public nuisance. With respect to CMC's potential independent CERCLA liability, the State further contends that CMC is liable under CERCLA as an "operator" of the contaminated Kraft Road site. Lastly, the State asserts that it can establish, as a matter of law, that CMC is liable for maintaining a public nuisance at the Kraft Road site. There is no need for the court to address these alternative arguments, however, given the fact that the court is convinced, that CMC may be held liable, on a theory of successor liability, under the 1990 Judgment.

To conclude, after carefully scrutinizing the quite voluminous record in this case, and, the court stresses, after examining all of the facts together—**not** in a piecemeal fashion—

the court is absolutely convinced, for all of the reasons set forth herein, that the State's motion for partial summary judgment must be granted, but not in all respects. The State's motion for partial summary judgment is granted against defendant Container Management Corporation, as a successor corporation to defendant N. Storonske Cooperage Company, Inc., premised upon *de facto* merger and/or "continuing enterprise" (also known as "substantial continuity") theories of successor liability. In all other respects, the State's motion for partial summary judgment is denied.

The Clerk of the Court is hereby directed to enter judgment in accordance with the terms of this order.

IT IS SO ORDERED.