**KLEEN LAUNDRY & DRY CLEANING SERVICES, INC.**

v.

**TOTAL WASTE MANAGEMENT, INC.**

Civ. No. 91–493–JD.

United States District Court,
D. New Hampshire.

Oct. 12, 1994.

---

Eleanor H. MacLellan, Sulloway & Hollis, Concord, NH, Franklin G. Stearns, Brown, Rudnick, Freed & Gesmer, Boston, MA, Maureen D. Smith, Atty. General's Office, Environmental Protection Bureau, Concord, NH, for plaintiff.

Paul J. Barbadoro, Andrew W. Serell, Rath, Young, Pignatelli & Oyer, P.A., Concord, NH, for defendant.

## OPINION

DiCLERICO, Chief Judge.

This lawsuit concerns a parcel of contaminated property ("site") owned by plaintiff Kleen Laundry and Dry Cleaning Services ("Kleen") and located in Lebanon, New Hampshire. In October 1991, the plaintiff brought an action under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C.A. § 9601 *et seq.* (West 1983 & Supp.1994), against the defendant, Total Waste Management, Inc. ("TWM"), seeking costs related to the cleanup and remediation of the site. The

plaintiff asserts that TWM is liable by virtue of its removal of the tanks at the site and also in its capacity as the corporate successor to George West & Sons d/b/a Portland Oil Recycling ("Portland Oil") or George West & Sons d/b/a Conn–Val Oil Recycling ("Conn–Val"), two companies that allegedly stored waste oil in the Kleen tanks.

On March 19, 1993, the court denied the defendant's motion for summary judgment on the issue of its liability as a successor to Portland Oil. The court found that TWM's successor liability hinged on the consideration of genuine issues of material fact. On September 7, 1994, the court conducted an evidentiary hearing to determine whether TWM succeeded to the liabilities of Portland Oil under CERCLA.

### Background

The following facts are not in dispute. On May 1, 1984, Conn–Val leased two underground storage tanks located at the site from the plaintiff and, as part of a written contract, agreed to absolve the plaintiff of all liability related to their use. The following day, the plaintiff was issued a certificate of insurance naming Portland Oil as the insured under at least three policies covering potential liabilities at the Kleen site. Conn–Val ceased operations approximately six weeks later. The Kleen tanks were drained and use of the plaintiff's property ceased.

On May 31, 1988, the defendant executed an agreement ("agreement") to purchase the bulk of Portland Oil's operating assets, including the Portland Oil name, customer lists, vehicles, and leases. George West & Sons, the former parent of Portland Oil, retained certain non-operating assets, such as office furniture and those accounts payable/receivable existing at the time of the sale. In addition, George West & Sons and Mr. George West III, former president and sole shareholder, signed non-compete agreements at the defendant's request. The agreement did not call for an exchange of stock or other form of ownership interest between the two companies or their principals. The agreement is silent on matters related to Conn–Val and the Kleen site and these topics were not raised during the nego-

tiations that resulted in the defendant's 1988 acquisition.

Following the acquisition, the defendant retired the Portland Oil name but continued uninterrupted service to Portland Oil customers using former Portland Oil trucks driven by former Portland Oil employees. George West & Sons continued to exist as a distinct business entity for the limited purposes of winding down its accounts and also as a parent company to Mr. West's nursery business.

There are two issues to be resolved by this opinion. Did the 1988 transaction merely call for the sale of certain Portland Oil assets or did it involve the sale of the entire business such as to create successor liability under CERCLA? And, if the latter, was Conn–Val an independent business entity or an integrated part of Portland Oil resulting in the attrition of all Conn–Val activities and liabilities to Portland Oil?

### Findings of Fact and Conclusions of Law

I. *Total Waste Management, Inc.'s Liability as Corporate Successor to George West & Son d/b/a Portland Oil Recycling*

The plaintiff alleges that TWM has succeeded to the liabilities of Portland Oil because the 1988 agreement called for and resulted in the acquisition of the entire Portland Oil business. Plaintiff's Memorandum of Law in Support of Request for Findings of Fact and Rulings of Law ("Plaintiff's Memorandum") at 9. In contrast, the defendant characterizes the transaction as merely an asset purchase. Defendant's Memorandum of Law in Support of Motion for Summary Judgment on Successor Liability ("Defendant's Memorandum") at 7.

■ At common law, a corporation which purchases the business assets of another does not assume the liabilities of the predecessor corporation absent the application of one of four exceptions to this general rule: (1) the successor expressly or impliedly agrees to assume liability; (2) the transaction may be considered a *de facto* merger; (3) the successor may be considered a "mere continuation" of the predecessor; or (4) the transaction is found to have been fraudulent.

**1140**

John S. Boyd Co. v. Boston Gas Co., 992 F.2d 401, 408 (1st Cir.1993); *United States v. Carolina Transformer Co.*, 978 F.2d 832, 837–38 (4th Cir.1992) (*citing* Fletcher, Cyclopedia of the Law of Private Corporations, § 7122 (rev'd ed. 1990)); *Atlantic Richfield Co. v. Blosenski*, 847 F.Supp. 1261, 1283–84 (E.D.Pa.1994) (citations omitted).

Earlier in the litigation the plaintiff, conceding that the first and fourth exceptions do not apply, argued that the defendant is a successor under either the *de facto* merger or "mere continuation" exceptions. *Kleen Laundry & Dry Cleaning Servs., Inc. v. Total Waste Management Corp.*, 817 F.Supp. 225, 230 (D.N.H.1993).

■ The *de facto* merger exception permits the court to hold a purchaser of business assets liable for the conduct of the transferor corporation if the parties have achieved "virtually all the results of a merger," even if they have not observed the statutory requirements of a *de jure* merger. *Kleen Laundry*, 817 F.Supp. at 230 (citing *In re Acushnet River & New Bedford Harbor Proceedings re: Alleged PCB Pollution*, 712 F.Supp. 1010, 1015 (D.Mass.1989)). The court examines four factors when determining whether a purported asset sale constitutes a *de facto* merger:

(1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.

(2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operations, liquidates and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Id.* at 230–231 (citing *Acushnet River*, 712 F.Supp. at 1015). While all of these factors favor the finding of a *de facto* merger, "no one of these factors is either necessary or sufficient to establish a *de facto* merger." *Id.* (citing *Acushnet River*, 712 F.Supp. at 1015).

■ Under the traditional view of the "mere continuation" exception, the court may find a corporation to be the continuation of predecessor corporation only if one party survives the purported asset sale and both parties share an identity of stock, stockholders and directors. *Id.* (citing *Carolina Transformer*, 978 F.2d at 838); *see Northwestern Mut. Life Ins. Co. v. Atlantic Research Corp.*, 847 F.Supp. 389, 399 (E.D.Va. 1994). However, other courts have adopted a broader interpretation of the exception, known as the "continuity of enterprise" or the "substantial continuity" doctrine. *Kleen Laundry*, 817 F.Supp. at 231 (citations omitted); *see Northwestern Mutual*, 847 F.Supp. at 399 (citations omitted). The court examines a series of factors when determining whether successor liability is appropriate under this alternative theory:

(1) retention of the same employees;

(2) retention of the same supervisory personnel;

(3) retention of the same production facilities in the same location;

(4) production of the same product;

(5) retention of the same name;

(6) continuity of assets;

(7) continuity of general business operations; and

(8) whether the successor holds itself out as the continuation of the previous enterprise.

*Kleen Laundry*, 817 F.Supp. at 231 (citations omitted); *see Northwestern Mutual*, 847 F.Supp. at 399. For example, the purchaser of a corporation's assets is liable as a successor where it continues the predecessor's operations without interruption and where the "primary assets involved in th[e] business [are] goodwill, customer lists, customer contract and routes, and the trucks and containers used to serve those customers."

*Atlantic Richfield,* 847 F.Supp. at 1290–91 (purchaser of assets of waste haul business liable as successor).

◼ Neither of these traditional doctrines, standing alone, is particularly well suited to either the goals of CERCLA or the contours of the present litigation. *See Kleen Laundry,* 817 F.Supp. at 233. As such, the court announced the application of a more flexible standard to govern the present question of whether TWM is in substance, if not in classic form, the successor to Portland Oil:

[S]trict adherence to the parochial requirements in CERCLA cases may in some instances conflict with the remedial policies underlying [CERCLA]. Therefore, the court will adopt a common sense rather than an overly restricted look at the corporate transfer.

*Id.* (quotations omitted). The pragmatic approach does not repudiate the factors regularly used to determine questions of corporate successorship under the *de facto* merger or "mere continuation" exceptions. Rather, the court considers the traditional doctrine in a somewhat more flexible manner in order to promote the broad remedial policies underlying CERCLA. *See United States v. Kayser-Roth Corp.,* 910 F.2d 24, 26 (1st Cir.1990), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991); *Smith Land & Improv. Corp. v. Celotex Corp.,* 851 F.2d 86, 91–92 (3d Cir.1988), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989); *Boyd,* 992 F.2d at 405 & n. 4; *see also Carolina Transformer Co.,* 978 F.2d at 837–39; *Atlantic Richfield,* 847 F.Supp. at 1283–84; *United States v. Distler,* 741 F.Supp. 637, 642 (W.D.Ky.1990). The court is guided by the principles behind the application of the successor liability doctrine in CERCLA cases:

Congressional intent supports the conclusion that, when choosing between the taxpayers or a successor corporation, the successor should bear the cost. Benefits from use of the pollutant as well as savings resulting from the failure to use non-hazardous disposal methods inured to the original corporation, its successors, and their respective stockholders and accrued only indirectly, if at all, to the general public.

*Acushnet River,* 712 F.Supp. at 1013–14 (citing *Smith Land,* 851 F.2d at 91–91).

◼ The court finds that TWM purchased the Portland Oil business notwithstanding the absence of certain formalities present in a traditional merger or acquisition. The May 31, 1988 agreement, which laid the foundation for this now-disputed transaction, is explicit on this point:

Seller agrees to sell and Buyer agrees to purchase from Seller the Seller's *waste oil collection and sales business,* including ·Seller's Collection and Sales Customer Lists and telephone numbers, which business Seller now operates in the States of Maine, New Hampshire, and Vermont.

Plaintiff's Exhibit 1, ¶ 1 (emphasis supplied). Later provisions of the agreement are similarly clear that the parties intended that "Seller shall deliver to the Buyer a Bill of Sale to vest in the Buyer *free and clear title to the Seller's waste oil collection and sales business."* *Id.* at ¶ 2 (emphasis supplied); *see* ¶ 3 ("purchase price for the Seller's waste oil collection and sales business is"). The court recognizes that the agreement and related papers specifically itemize certain assets for inclusion in the transaction, such as trucks, tanks and customer lists, while expressly excluding others from purchase, such as Portland Oil's accounts receivable and office furniture. Exhibit 1 at ¶¶ 4–7; Exhibit 2 at 1 & Attachment A. However, the fact that the written documents happen to include a catalogue of assets does not preclude a finding that the agreement was executed for the sale of a business.

In arriving at this finding, the court has placed great weight not only on the face of the agreement, but also on the conduct and relationship of the parties before and after the sale was completed. George West III, the president and owner of Portland Oil, wanted to leave the oil recycling industry altogether and has testified at deposition that this was the purpose behind the 1988 transaction. Exhibit 6 at 50. Donald Littlefield, then vice president and currently president of TWM, knew Mr. West wanted to leave the industry and considered the transaction a prime opportunity to eliminate a competitor. Transcript, Evidentiary Hearing on Succes-

sor Liability ("Tr."), 9/7/94 at 29–30. Indeed, although he characterizes the 1988 transaction as simply an asset purchase, Mr. Littlefield required Mr. West to execute a noncompete clause as part of the deal. Exhibit 3; Tr. at 37–38 ("I paid over $400,000 for this company. Why would I have him compete against me?"). Finally, Mr. Littlefield himself described the 1988 transaction as the purchase of an "oil collection business" even though he has insisted throughout that it was no more than an asset purchase. Tr. at 29–31.

The course of events following the agreement further indicates that the defendant purchased an entire business. After the sale was completed, TWM moved to integrate Portland Oil's operations into its own. The defendant either retired the Portland Oil trucks or, where salvageable, repainted them to bear the TWM insignia. Tr. at 20–21, 34–35. The defendant hired and retrained five out of eight or nine Portland Oil drivers. Tr. at 35. A caller to Portland Oil's telephone line would automatically be transferred to the defendant's office and answered as TWM. Tr. at 21, 36. The defendant assumed Portland Oil's contracts for Yellow Pages advertisements. Exhibit 1 at ¶ 4; Tr. at 19. The defendant also received the rights to the Portland Oil name. Tr. at 34–35, 41.

Perhaps most significantly, the defendant assumed Portland Oil's customers and serviced them without interruption with the same drivers and trucks but under the TWM name. Tr. at 35.

Q. The Portland Oil customers were not given any communication about this transaction, were they?

A. No, there was a letter that was delivered by our drivers that indicated that *we had bought the company and that ... TWM was going to service them.*

Q. So a customer would then simply get a bill on a TWM letterhead rather than Portland Oil.

A. Correct.

Tr. at 36 (emphasis supplied). This seamless client transfer reveals that the defendant purchased and operated a complete business and, in so doing, tacitly held itself out to the public as the continuation of the Portland Oil. Moreover, following the sale of its waste oil business, George West & Son's was nothing more than a corporate shell for the winding down of various financial obligations and existed as a parent company to an unrelated nursery business. Exhibit 6 at 48–51. Although this continuation of the (George West & Sons) business bars a finding of corporate successorship under the *de facto* merger exception, such a formalistic distinction has little bearing on this court's common sense analysis. *See Boyd,* 992 F.2d at 408–09; *Acushnet River,* 712 F.Supp. at 1015.

The 1988 transaction, both as conceived and consummated, has yielded sufficient indicia of corporate transfer and consolidation for the court to find that the defendant succeeded to Portland Oil in substance, if not in traditional form.[1]

## II. *Total Waste Management's Liability for Conduct Associated with Conn–Val Oil Recycling*

The next step in the court's inquiry is to determine whether the Portland Oil liabilities that TWM succeeded to include those activities at the Kleen site associated with Conn–Val. This requires a determination of whether Conn–Val was an independent business entity or instead an integrated part of the Portland Oil business.[2]

The defendant urges that, even if it is a successor to Portland Oil, it cannot be held liable for remediation costs because the environmental damage at that site was caused by

---

1. Although the court has applied a pragmatic, common sense analysis to the successor liability issue, the court would have arrived at the same conclusion even under a more traditional approach. A review of the factual record which has developed since the defendant's failed motion for summary judgment reveals that the defendant's purchase of Portland Oil contains many of the factors pointing towards successor liability under the substantial continuity doctrine.

2. The court has already determined that TWM is not liable as a successor to Conn–Val in the event that Conn–Val is determined to be an independent business entity. *Kleen Laundry,* 817 F.Supp. at 232.

Conn–Val, a separate division of George West & Sons that was disbanded several years prior to the 1988 purchase. Defendant's Memorandum at 6–7, 10–11; Tr. at 41–44. The defendant asserts that its officers were not even aware of the prior existence of Conn–Val until well after it purchased Portland Oil and that it would be fundamentally unfair to burden them with its liabilities. Defendant's Memorandum at 10–11; Tr. at 41–43.

The plaintiff responds that Conn–Val was never a distinct business entity such as to give rise to its own liability. Plaintiff's Memorandum at 3. Rather, it argues that Conn–Val was legally indistinguishable from Portland Oil and, as a result, when TWM purchased the oil recovery business, any lingering assets or liabilities associated with Conn–Val went along with it. *Id.* at 3–4.

### A. Conn–Val Was at All Times Part of Portland Oil

 Courts are frequently called upon to untangle corporate webs in their efforts to distribute liability appropriately. *See Boyd,* 992 F.2d at 408; *Kayser–Roth,* 910 F.2d at 27. For purposes of CERCLA liability an internal division of a corporation does not have a separate legal existence from the corporation itself. *Atlantic Richfield,* 847 F.Supp. at 1292. Likewise, a parent corporation which exercises "persuasive control" over an autonomous subsidiary may be liable under an operator theory for the subsidiary's environmental torts. *Kayser–Roth,* 910 F.2d at 26–27; *see Boyd,* 992 F.2d at 408. Under this theory, the parent is held responsible for *its* own activities as an operator and, because the liability is direct, the court need not pierce the veil. *Boyd,* 992 F.2d at 408 (citing *Kayser–Roth,* 910 F.2d at 27). When determining whether a parent exercised persuasive control over a subsidiary, the court undertakes a fact-specific examination of both the formal and practical relationship between the two entities. *See Boyd,* 992 F.2d at 408;

*Atlantic Richfield,* 847 F.Supp. at 1292–93. The court considers the nature and extent of the parent's involvement in the financial, managerial and personnel decisions of the subsidiary when determining if the parent "exerted practical total influence and control over the [subsidiary's] operations." *Kayser–Roth,* 910 F.2d at 27 (quotations omitted); *see Boyd,* 992 F.2d at 408.

 The court finds that, notwithstanding the use of the label Conn–Val, all relevant conduct at the Kleen site was performed as part of the Portland Oil business.

First, Conn–Val was never officially established as an independent business. Exhibit 6 at 23–24. It was neither incorporated under any state laws nor recognized as a distinct entity in any written document. *Id.* at 24. Rather, Conn–Val was the name used by a short-lived venture that undertook the same waste oil recovery activities as Portland Oil but in a different geographic area. *Id.* at 16–18. Conn–Val was financed by Portland Oil and, for its life of approximately six weeks, operated a single truck owned by Portland Oil. *Id.* at 15, 18, 32. It was managed on a day-to-day basis by Charlie Wasson, who reported back to George West to discuss financial details and matters related to maintenance of the truck. *Id.* at 22–23. And when Conn–Val failed to reach George West's expectations, he shut it down, removing whatever oil it was storing with Portland Oil trucks. *Id.* at 16–17, 36, 71.[3]

Second, the circumstances surrounding the use of the Kleen tanks also reveal that Conn–Val was not an independent business. In a document executed on May 1, 1984, Conn–Val agreed to pay the plaintiff $200 a month for use of the storage tanks at the Kleen site. Exhibit 4. The agreement also included what appears to be an indemnification provision whereby Conn–Val "agree[d] to absolve [the plaintiff] of all liability" related to the use of the tanks. *Id.* Portland Oil does not appear on the face of the agreement. *Id.*

---

**3.** The informality of the relationship between Portland Oil and Conn–Val is underscored by Mr. West's inability to consistently describe its nature. During his deposition, Mr. West refers to Conn–Val alternately as a business or a division. *E.g.,* Exhibit 6 at 24, 33, 60. Having ruled

that Conn–Val was never a cognizable entity apart from George West & Son's oil recovery business (Portland Oil), this court need not identify precisely where Conn–Val would fall in the traditional corporate taxonomy.

However, Portland Oil arranged for a certificate of insurance to be issued to the plaintiff listing Portland Oil as the insured under policies covering general, automobile and workers' compensation/employers' liability.[4] Exhibit 5; Exhibit 6 at 58–59. The defendant has not been able to offer a reasonable explanation of why Portland Oil would hold itself out to both its insurance companies and the plaintiff as the party responsible for potential liabilities at the Kleen site if Portland Oil did not consider the Conn–Val activities to be part of its overall oil recovery business.

Finally, when George West decided to withdraw from the Connecticut Valley market, he drained the waste oil from the Kleen tanks into Portland Oil trucks. Exhibit 6 at 16–17, 36, 71.

■ In both a technical and practical sense, Conn–Val never existed as anything other than an informal venture operating fully within George West & Son's overall oil recovery business, Portland Oil. However, even if the court determined that Conn–Val was as an independent subsidiary, Portland Oil would still be directly liable as an operator. There can be little doubt that Portland Oil exercised "persuasive control" over Conn–Val considering that it financed the entire operation, owned all the equipment, initiated and discontinued service in the space of six weeks and, at one point, was even consulted about how to address problems related to a worn tire and truck battery.

### B. TWM's Ignorance of Conn–Val Activities Does Not Shield It From CERCLA Liability.

The defendant has placed great weight on evidence that its officers had no idea that Portland Oil operated as Conn–Val several years earlier and, as a result, unknowingly exposed TWM to CERCLA liability when it signed the 1988 Agreement. Defendant's Memorandum at 10–11; Defendant's Response at 2; Tr. at 44. This ignorance is the cornerstone of defendant's argument that it would be fundamentally unfair to burden TWM with the liabilities of oil recovery activities that it was unaware of and that had ceased operation prior to its purchase. Defendant's Memorandum at 11; Defendant's Response at 2.

The court does not question the veracity of defendant's claims of ignorance concerning Portland Oil activities associated with the name Conn–Val. Nonetheless, the court does not consider this to constitute a bar, equitable or otherwise, to today's finding of successor liability for the Kleen site.[5] CERCLA is a remedial statute which has been broadly construed to hold "the company that sullied the property responsible for the costs of cleanup." Boyd, 992 F.2d at 405; see Carolina Transformer, 978 F.2d at 838. Both the goals of CERCLA and fundamental fairness require that if Portland Oil, under its own name or that of Conn–Val, is found to have contaminated the Kleen site, all resulting liability remains with the business and, in turn, passes to TWM as successor.

---

4. The defendant has placed great reliance on the fact that the certificate of insurance reflecting coverage for the Kleen site listed "George West & Sons, DBA Portland Oil Recycling Et Al" as the insured party. Defendant's Request for Findings of Fact and Rulings of Law at ¶ 9 ("Defendant's Request"); Defendant's Response to Plaintiff's Memorandum of Law in Support of Request for Findings of Fact and Rulings of Law at 3 ("Defendant's Response"). Defendant argues that the inclusion of the term "et al" tacitly acknowledges the existence of other, unspecified businesses that were operated as independent companies under the larger George West & Son's umbrella. Id. at 3. The court finds the argument unpersuasive in view of the strong evidence indicating that Conn–Val was merely a label or informal arm of the Portland Oil business.

5. The court understands that, in retrospect, the defendant assumed an environmental lawsuit when it thought it was just purchasing a business. However, the agreement was negotiated and signed in 1988, eight years after the well-publicized enactment of CERCLA. By this time, Mr. Littlefield, a TWM officer and principal, had at least ten years experience in the waste oil industry and, prior to working for the defendant, had served as compliance manager for a similar business. Tr. at 5–6. This expertise should have led the defendant to recognize that the disposal of used petroleum invariably creates the risk of environmental liability and, as such, potential acquisitions in the industry should be scrutinized with due diligence. If Portland Oil's activities at the Kleen site were unknown to the defendant at the time of purchase, they may not have been unknowable.

*Conclusion*

In executing the 1988 Agreement, the defendant was able to expand its business by assuming the ongoing operations and all necessary assets of a key competitor in a single transaction. The defendant has reaped the commercial benefits of its purchase of Portland Oil and, by the same token, should not be allowed to step away from the burdens that go along with it.

The court finds TWM is the corporate successor to Portland Oil Recycling for purposes of CERCLA liability. The court also finds that Conn–Val Oil Recycling was never a cognizable business entity independent of Portland Oil and, as such, any liabilities associated with the former properly rest with the latter.

SO ORDERED.