Kelly v. Kercher Machine                    CV-94-349-JD  10/31/95 P

UNITED STATES DISTRICT COURT FOR THE
                        DISTRICT OF NEW HAMPSHIRE


Shawn P. Kelly, et al.

     v.                                      Civil No. 94-349-JD

Kercher Machine Works, Inc.


                           O R D E R


     The plaintiffs, Shawn Kelly and Diana Kelly, bring this

products liability action against the defendant, Kercher Machine

Works, Inc. ("KMW"), for injuries related to Shawn Kelly's use of

a brick-making machine.  Before the court is KMW's motion for

summary judgment (document no. 7) on the successor liability

issue.

                          Background[1]

     At all relevant times Shawn Kelly was employed as an

assistant superintendent at the Kane-Gonic Brick Company, Gonic,

New Hampshire.  On or about July 8, 1991, Kelly's left thumb was

amputated while he was operating a brick-making machine, known as

the Martin 36-HO Vertical Type Brick Machine No. 12054-4

("machine").  The machine was designed, manufactured, and sold by

Posey Iron Works, Inc., Lancaster, Pennsylvania ("Posey"),

_____

     [1]The court's recitation of the facts relevant to the instant
motion are either not in dispute or have been alleged by the
plaintiff.

sometime during the 1950s. Affidavit of Edwin Kercher ("Kercher Affidavit") at ¶ 24. At the time of its sale and at the time of the plaintiff's injury, the machine was an unreasonably dangerous product because, inter alia, it's design concealed rotating splines from the operator's view and lacked necessary safety guards to protect operators from the splines. See Complaint at ¶¶ 16-22.

KMW was founded as a machining and fabricating job shop in 1946 and, in 1959, was formerly incorporated under Pennsylvania law. Since its inception KMW has maintained its principal place of business, including corporate offices, at 920 Mechanic Street, Lebanon, Pennsylvania.

Prior to December 1983, Posey operated an iron pipe fabrication business at its corporate headquarters in Lancaster, Pennsylvania. However, its smaller special products division designed and manufactured mixing equipment, brick machinery, asphalt dryers, and related equipment. On December 7, 1983, KMW, through its president, Edwin Kercher, executed an agreement with Posey for the purchase of

> all of the assets of the machinery and Special Products
> Divisions of [Posey] consisting of, but not limited to,
> inventory and raw materials based on [Posey's]
> inventory value of November 28, 1983, gear cutting
> machine with all attendant tooling, drawings, customer
> lists, trade names, patents, patterns, dyes, jigs,
> fixtures and open orders as of the date of this
> Agreement of Sale.

2

Purchase and Sale Agreement ("P & S") at ¶ 1.  The agreement further provided that

> [Posey] agrees to indemnify and hold Purchaser harmless for any loss Purchaser may suffer or for claims made against Purchaser by reason of [Posey's] manufacture, production, shipping, issuance or other business activity prior to Purchaser taking possession of said assets.  [Posey] further agrees to pay Purchaser's legal costs in defending any actions or claims arising as a result of the aforesaid.

Id. at ¶ 7.  Kercher has testified that the indemnification provisions of the P & S reflect his understanding that "there was never any expressed or implied assumption of Posey's liabilities by [KMW]."  Kercher Affidavit at ¶ 17.  Consistent with this understanding, Posey paid all liabilities and claims filed prior to or during liquidation in accordance with a list of creditors, a list of open bulk accounts, an escrow agreement, and the notice of bulk transfer.  Id. at ¶¶ 18, 19.[2]

KMW never purchased an interest in Posey and the shareholders and directors of the two entities were at all times "unrelated, separate and distinct."  Kercher Affidavit at ¶ 11.

---

[2]In 1983, Edwin Kercher, the president of KMW, incorporated Kercher Industries ("KI"), for the purpose of taking title to certain assets purchased by KMW from Posey.  Kercher Affidavit at ¶ 20.  According to Kercher, KI engineers and markets products which are manufactured by KMW.  Kercher Deposition at 6, 11.  Under this arrangement, KMW "is still essentially a jobbing shop [and KI] now happens to be its primary biggest customer."  Id. at 13.  The plaintiff has not named KI as a defendant and, as such, the court need not determine whether KI succeeded to Posey's liabilities.

3

KMW never occupied facilities formerly owned or operated by Posey. Id. at ¶ 10. According to Kercher, Posey was a small, family-owned business that was "winding down" in 1983 when it sold the special products division to KMW. Id. at ¶ 8. Posey ceased operating its pipe fabrication business at around the same time and liquidated all remaining assets. Id. at ¶¶ 8, 12. Since 1983 KMW has employed one former employee of Posey, Ken Carpenter, who was also a personal friend of KMW's president. Id. at ¶ 14.

Following the purchase, KMW reviewed files received from Posey and generated a customer list of "mixer people and brick people we knew of." Deposition of Edwin Kercher ("Kercher Deposition") at 21. On December 21, 1983, KMW mailed the following letter to these individuals:

> We at Kercher Machine Works, Inc., are pleased to announce the acquisition of the Lancaster Mixer, Brick Machinery and Special Products Division of the Posey Iron Works. It is our intention to make this transition as quickly and smoothly as possible to avoid interruptions in deliveries or other inconveniences to the customers of these divisions.
>
> Kercher Machine Works, Inc., has been supplying quality machining and fabricating since 1945. We have over 70,000 square feet of manufacturing space available and employ 40 people. It should be noted that we have been manufacturing parts for Posey for several years. We will be manufacturing these products using the original name and design. We will also be supplying spare parts and replacements as before. As technology advances, and through customer suggestions and our own research, we will endeavor to continuously

4

> improve these products to give the customer the best product and service available.
>
> Our people look forward to doing business with you for many years, giving prompt service and quality products at reasonable prices. If there is anything we can do for you in providing quotations, information, or service, please contact us at (717) 273-2111.

Id., exhibit 4A. Kercher testified that the purpose of the letter was to inform customers of the asset purchase and to solicit future business. Id. at 22-23. KMW made no efforts to "follow up" on the letter and neither mailed unsolicited correspondence nor otherwise contacted individuals receiving the December 21, 1983, letter. Id. at 21-23. Other than the letter, KMW did not advertise or publicize the purchase. Answers to Plaintiffs' Interrogatories ("Interrogatory Answers") at ¶ 28.

Although KMW acquired various drawings and designs when it purchased Posey's assets, KMW has never manufactured a product based on these designs. Kercher Deposition at 45. Similarly, KMW has never manufactured or sold a product bearing the "Posey" or the "Martin" name or logo. Kercher Affidavit at ¶¶ 22, 25. However, KMW did purchase and since 1983 has used the trade name "Lancaster Products." Interrogatory Answers at ¶ 36. Following the purchase, KMW produced mixing equipment, brick-making equipment, and aggregate drying equipment similar to that previously manufactured by Posey. Id. at ¶ 24. KMW designed and manufactured the Lancaster 46B Brick Making Machine based on

5

Posey's earlier Model 46B and Lancaster Muller Mixers.  <u>Id.</u> at ¶ 32.  When KMW designed the "Lancaster 46B" it enclosed several gears and other moving parts, including the part that caught the plaintiff's thumb, which were exposed and unprotected on the Posey machines, such as the Posey Model 46 and the "Martin" machine which injured the plaintiff.  <u>See</u> Kercher Deposition at 33-38.

In the past, KMW also has serviced Posey products, Interrogatory Answers at ¶ 25, and has fabricated replacement parts for machines originally manufactured by Posey in the same manner that it "fabricates machine parts on special order for other unrelated machinery and for other customers," Kercher Affidavit at ¶ 23.  KMW never places a trade name on the replacement parts it manufactures.  Kercher Deposition at 41.

Sometime prior to November 1990, representatives from either KMW or KI visited certain plants operated by its clients.  Based on these visits "we realized that people were apparently not guarding their machines the way they should be.  We thought dangerous conditions had existed, and that we didn't see until we started to get out and into the various plants."  Kercher Deposition at 30.  On November 1, 1990, Kercher mailed the following letter:

```
          LANCASTER AUTOBRIX MACHINE CUSTOMERS
            AN ALERT TO DANGEROUS MAINTENANCE
          AND OPERATING ----------- PRACTICES
```

Gentlemen,

An extremely dangerous maintenance and operating practice appears to exist in many plants using the Lancaster AutoBrik Machine. The practice involves stopping the machine by means of the drive clutch only while doing work in or around the machine which may allow a person to be injured or killed should the machine unexpectedly start.

The main drive clutch is designed solely to provide a means to stop the machine from producing brick or as a first step in the complete shutdown of the machine for any type of repair, adjustment, maintenance etc. A complete shutdown can occur only if the main drive motor or motors are stopped and the electrical power is locked out to these motors.

A malfunction of this clutch or components associated with it may cause the machine to operate whenever the drive motor is turning. This can happen even when the operator has "disengaged" the clutch.

Therefore it is imperative that a complete shutdown of the Lancaster AutoBrik Machine occurs (including lockout of all electrical power) before any work is allowed to be performed on or around the machines.

Please alert all operators and personnel working on or around these machines of these conditions.

Another area of concern is in proper guarding around the Lancaster AutoBrik Machine. Because each installation of these machines is unique, it is impossible to forecast all the means of access to possible harmful areas of the machine. Therefore it is imperative that management from each company carefully survey their installation to assure that all guarding is adequately provided and in place.

> If we at Kercher Industries can be of any service to you please contact us.

Id., exhibit 5.  In addition to the November 1990 letter, KMW and/or KI verbally advised customers of safety risks observed during the course of plant visits.  Id. at 31.

## Discussion

The role of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."  Snow v. Harnischfeger Corp., 12 F.3d 1154, 1157 (1st Cir. 1993), cert. denied, 115 S. Ct. 56 (1994) (quoting Wynne v. Tufts Univ. Sch. of Medicine, 976 F.2d 791, 794 (1st Cir. 1992), cert. denied, 113 S. Ct. 1845 (1993)).  The court may only grant a motion for summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of establishing the lack of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992).  The court must view the entire record in the light most favorable to the

plaintiffs, "`indulging all reasonable inferences in that party's favor.'" Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990), cert. denied, 112 S. Ct. 2965 (1992)). However, once the defendant has submitted a properly supported motion for summary judgment, the plaintiffs "may not rest upon mere allegation or denials of [their] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)).

In its motion the defendant asserts that it is entitled to judgment as a matter of law because it had no involvement in Posey's design, manufacture, or sale of the machine that allegedly caused the plaintiff's injury. The defendant further asserts that it cannot be held liable for the acts or omissions of Posey under any recognized theory of successor liability.

The plaintiffs respond that discovery has revealed a genuine dispute of fact on the material legal question of whether the defendant is liable because of its de facto merger with Posey or its mere continuation of Posey's operations.

At common law, a corporation which purchases the business assets of another does not assume the liabilities of the predecessor corporation absent the application of one of four

exceptions to this general rule: (1) the successor expressly or impliedly agrees to assume liability; (2) the transaction may be considered a de facto merger; (3) the successor may be considered a "mere continuation" of the predecessor; or (4) the transaction is found to have been fraudulent. MacCleery v. T.S.S. Retail Corp., 882 F. Supp. 13, 16 (D.N.H. 1994) (products liability); Kleen Laundry & Dry Cleaning v. Total Waste Management Corp., 867 F. Supp. 1136, 1139-40 (D.N.H. 1994) (CERCLA) (citing John S. Boyd Co. v. Boston Gas Co., 992 F.2d 401, 408 (1st Cir. 1993)); Nichols v. Roper Whitney Co., 843 F. Supp. 799, 802 (D.N.H. 1994) (products liability).

The plaintiffs argue that the defendant is a successor under either the de facto merger or the mere continuation exceptions. See Plaintiffs' Memorandum in Objection to Summary Judgment at 8-9.

I. The De Facto Merger Exception

The de facto merger exception permits the court to hold a purchaser of business assets liable for the conduct of the transferor corporation if the parties have achieved "virtually all the results of a merger," even if they have not observed the statutory requirements of a de jure merger. MacCleery, 882 F. Supp. at 16; Kleen Laundry, 867 F. Supp. at 1139. The court

10

examines four factors when determining whether a purported asset sale constitutes a de facto merger:

> (1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.

> (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

> (3) The seller corporation ceases its ordinary business operations, liquidates and dissolves as soon as legally and practically possible.

> (4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

MacCleery, 882 F. Supp. at 16; Kleen Laundry, 867 F. Supp. at 1140. While all of these factors favor the finding of a de facto merger, "no one of these factors is either necessary or sufficient to establish a de facto merger." MacCleery, 882 F. Supp. at 16 (quoting Kleen Laundry, 817 F. Supp. at 230-32). The court applies each factor seriatim.

First, the parties agree that KMW purchased certain business assets from Posey. Some of these assets were tangible, such as equipment and raw materials, while others were intangible, such as drawings and trade names. The asset transfer was not accompanied by a continuity of management, physical location, or

11

general business operations. Although KMW did hire one former Posey employee, this single act cannot constitute a "continuity of personnel" considering the employee was a personal friend of KMW's president who had worked in an unrelated Posey division prior to the sale of the special products division. The court finds that the transfer of assets, absent more, does not satisfy the first factor of the de facto merger analysis.

The court's application of the second factor also militates against the imposition of successor liability. It is clear from the P & S and related documents that KMW, having secured financing through a third party, paid cash for the Posey assets. Equally clear is that the transaction did not involve a stock transfer or a continuity of shareholders or officers.

For purposes of the third factor the defendant concedes that Posey ceased its ordinary business operations and liquidated all remaining assets in the months that followed its asset sale to KMW. This fact supports the plaintiffs' theory that the 1983 transaction constituted a de facto merger. However, the strength of this factor is undermined to some extent by other undisputed facts. Specifically, the plaintiffs have not challenged KMW's evidence that Posey, a family-owned company, ceased operations for reasons unrelated to the asset purchase. Cf. MacCleery, 882 F. Supp. at 17 (imposition of successor liability favored where

evidence indicates that dissolved company "may have ceased its ordinary business operations for reasons related to the execution of [asset purchase] agreement").  Likewise, there is no dispute that KMW only purchased the assets of the special products division, a small component of Posey's overall operation considered incidental to Posey's principal focus on pipe fabrication.  See Kercher Affidavit at ¶¶ 7-9; Kercher Deposition at 16 (special products division was a "minor part" of Posey's business).

Fourth, the plaintiffs assert that KMW assumed those obligations of Posey ordinarily necessary for a continuation of Posey's normal business operations.  This argument also is imperiled by the fact that KMW only purchased assets related to a an indisputably small portion of Posey's normal business operations.  Moreover, the transaction was contingent on Posey's retention of all liabilities and obligations related to its business, including those associated with the assets ultimately acquired by KMW.  The plaintiffs' failure to adduce evidence on either of these points forecloses reliance on the fourth de facto merger factor.[3]

---

[3]The plaintiffs place great weight on evidence concerning KMW's maintenance of an inventory of replacement parts for Posey machines, its service of Posey machines, and the written announcement of its purchase to customers identified through the use of purchased Posey records.  The court finds that these facts

13

The court finds that the evidentiary record, taken in a light most favorable to the plaintiffs, reveals an uncomplicated asset transfer lacking the indicia of a merger considered by the court under the first, second, and fourth elements of the de facto merger exception.  The plaintiffs' satisfaction of the third factor, that Posey ceased operations following the asset sale, alone cannot support a jury finding that the 1983 transaction achieved "virtually all the results of a merger" for purposes of imposing successor liability under the exception. MacCleery, 882 F. Supp. at 16 (satisfaction of only one factor not sufficient to invoke de facto merger exception).

II.  The Mere Continuation/Substantial Continuity Exception

Under the traditional view of the "mere continuation" exception, the court may find a corporation to be the continuation of a predecessor corporation only if one party survives the purported asset sale and both parties share an identity of stock, stockholders, and directors.  MacCleery, 882

---

properly are considered in the context of the mere continuation exception and not in terms of the de facto merger exception because they bear directly on the question of whether KMW, despite the formal terms of the transaction, "more closely resembles a reorganized version" of Posey than a distinct entity. Nichols, 843 F. Supp. at 804.

14

F. Supp. at 17; Kleen Laundry, 867 F. Supp. at 1140.  However,
New Hampshire courts and others recently have adopted a broader
interpretation of the exception, known as the "continuity of
enterprise" or the "substantial continuity" doctrine.  MacCleery,
882 F. Supp. 17 (citing cases).  In general the exception applies
"whenever the successor corporation more closely resembles a
reorganized version of its predecessor than an entirely new
corporate entity."  Nichols, 843 F. Supp. at 804 (quoting 2 Louis
Frumer & Melvin Friedman, Products Liability § 7.04[4] (1993)).
The court examines a series of factors when determining whether
successor liability is appropriate under this alternative theory:

   (1) retention of the same employees;

   (2) retention of the same supervisory personnel;

   (3) retention of the same production facilities in the same
   location;

   (4) production of the same product;

   (5) retention of the same name;

   (6) continuity of assets;

   (7) continuity of general business operations; and

   (8) whether the successor holds itself out as the
continuation of the previous enterprise.

MacCleery, 882 F. Supp. at 17; Kleen Laundry, 867 F. Supp. at
1140.  Again, the court addresses each factor seriatim.

15

Several of these factors are easily addressed given the findings announced in connection with the court's de facto merger analysis. First, KMW retained one former Posey employee following the 1983 transaction and, for the reasons stated supra, the retention of this single employee is of no probative value in the successor liability calculus. Likewise, with respect to the second and third factors, the court has found, supra, that the record is clear KMW neither retained Posey's supervisory personnel nor retained Posey's production facilities in Lancaster, Pennsylvania.

Fourth, KMW's president has testified in an affidavit and during deposition that his company has never manufactured the same product as Posey, even though it owned the designs and the equipment necessary to do so. The plaintiffs have not challenged the veracity of this testimony and, as such, cannot rely on the fourth factor.

Fifth, the plaintiffs have adduced no evidence upon which a jury could find that KMW, which received rights to the name "Posey" under the P & S, ever, in fact, retained the "Posey" name as its own, as the name of a division or product line, or even as a label used to identify individual products. Unlike the defendant in MacCleery, which formally incorporated itself and marketed products as "Royce Union Bicycle" after acquiring the

16

right to that name, in this case there is no evidence that KMW ever used the name "Posey" at any time after the December, 1983, announcement of the asset purchase. See 882 F. Supp. at 17.

The plaintiffs have satisfied the sixth element, the continuity of assets, by virtue of KMW's acknowledged purchase of certain Posey assets. However, the legal relevance of this element is minimal because any transaction involving the sale of assets by definition results in a continuity of assets. That is, the fact that a consummated asset purchase achieved its stated purpose is not directly probative of whether the transaction also displayed enough other indicia of business continuity to justify the imposition of successor liability.

With respect to the seventh factor, the court has already found, supra, that the plaintiffs have failed to marshal evidence to support a finding that KMW continued Posey's general business operations. Contrary to the plaintiffs' assertion, the fact that KMW continued to produce and maintain an inventory of replacement parts for Posey machines cannot reasonably be construed as evidence of a continuation of Posey's operations given the undisputed fact that KMW has always been a "jobbing shop" which manufactures custom parts to fit a variety of machines, including its own and those manufactured by other companies such as Posey. Indeed, the plaintiffs' evidence on this point indicates that

17

following the transaction KMW continued to operate its own replacement part and manufacturing business.

The plaintiffs' strongest evidence properly is considered in terms of the eighth factor, whether the successor has held itself out as the continuation of the previous enterprise. KMW's December 1983 written announcement of its purchase, mailed to former Posey customers, contains language which may be construed as a statement that KMW has purchased and would operate Posey's brick manufacturing division. The letter further indicates that the transition would be undertaken to avoid customer inconvenience or delay. The court finds that there is a factual dispute of whether, by virtue of the December 1983 letter, KMW held itself out as the continuation of certain Posey operations, even though the record is otherwise clear that KMW never, in fact, undertook such a continuation of operations.

The plaintiffs also rely on the defendant's November 1990 safety advisory as evidence that it was the continuation of Posey's business. The plaintiffs argue that "it is undisputed that the defendant sent letters to its customers regarding the extreme danger of personal injury that existed from lack of guarding on brick-making machines designed and manufactured by Posey." Plaintiffs' Memorandum in Opposition to Summary Judgment at 11 (emphasis omitted). The argument fails. As the plaintiffs

18

acknowledge, the letter is a safety advisory describing unsafe practices observed by KMW representatives during visits to plants operated by its customers. The purpose of the letter is obvious from its heading, "ALERT TO DANGEROUS MAINTENANCE AND OPERATING PRACTICES," and its content, which describes the observed hazards and recommends specific precautionary measures. Notably absent, is any mention of the name "Posey" or reference to the defunct company's prior existence. The letter contains no language from which a reasonably jury could conclude that KMW has held itself out as the continuation of Posey. Finally, the letter is presented on KMW/KI letterhead and concludes with the invitation that "[i]f we at Kercher Industries can be of any service to you please contact us." Even given an indulgent gloss under Rule 56, the November 1990 safety advisory is not probative of an effort on the defendant's behalf to hold itself out as the continuation of the previous enterprise.[4]

---

[4]KMW further argues that to use the safety advisory

to suggest a continuation of the Posey enterprise would penalize Kercher for discovering and disclosing the potential safety hazard associated with the Posey machinery and have an undesirable chilling effect on all such disclosure in the future.

Defendant's Response to the Objection to Summary Judgment at 7.

The court need not address the argument given its finding that the letter does not support the plaintiffs' position under the eighth factor. Nonetheless, the defendant correctly observes

19

The plaintiffs have established a genuine dispute of fact on only two of the eight factors relevant to the mere continuation exception. The court finds that the satisfaction of these two elements is legally insufficient to invoke the exception even under its liberal construction by New Hampshire courts. E.g., MacCleery, 882 F. Supp. at 17. To allow the plaintiffs to proceed to trial under a successor liability theory under these circumstances would compromise the general rule that the purchaser of business assets does not succeed to the liabilities of the seller.[5]

that the suggested use of a safety advisory to establish its author's liability for a product manufactured by a predecessor would frustrate the public policy of identifying unknown but discoverable hazards. The competing policy concerns are particularly apparent in the products liability context where the publication of a safety advisory and the imposition of successor liability apparently benefit the same constituency, namely victims or potential victims seeking compensation for personal injury.

[5]The plaintiffs have placed great reliance on Kleen Laundry, where this court ruled that the purchaser of the assets of a waste-oil transportation business also succeeded to the defunct business' environmental liabilities. See 867 F. Supp. at 1142.

The analogy is not persuasive. First, in Kleen Laundry the court applied a more flexible approach to successor liability to promote the broad remedial policies underlying CERCLA. See id. at 1141. In contrast, the instant products liability action, which presents none of the special policy considerations peculiar to federal hazardous waste law, is well-suited to analysis under the traditional doctrine of successor liability.

Second, the asset purchase at issue in Kleen Laundry, both as conceived and as consummated, yielded considerable indicia of

## Conclusion

The court finds that the evidentiary record, taken in a light most favorable to the plaintiffs, cannot support the imposition of successor liability under either the de facto merger or the mere continuation exception. Accordingly, the court grants the defendant's motion for summary judgment (document no. 7) and the clerk is ordered to close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
Chief Judge

October 31, 1995

cc:   Frank E. Kenison, Esquire
      Richard E. Mills, Esquire

_____

corporate transfer and consolidation. See id. at 1140-42. For example, the successor itself described the transaction as the purchase of an entire business and, consistent with this characterization, employed the majority of the predecessor's former employees to supply its former customers with the same goods and services. See id. at 1142. KMW's relationship to Posey's former brick machinery operation is far less interwoven and, as the court's analysis indicates, lacks the most basic hallmarks of a de facto merger or the mere continuation of a defunct business operation. Indeed, the cases are so dissimilar that the plaintiffs' heavy reliance on Kleen Laundry accentuates the weakness of their successor liability theory.

21